(April 28, 1925.)

JAMES E. CLINTON and H. H. HENDERSON, Appellants, v. UTAH CONSTRUCTION COMPANY, a Corporation, Respondent; COREY BROTHERS CONSTRUCTION COMPANY, a Corporation, W. W. COREY, W. E. COREY, O. O. COREY and A. T. COREY, Defendants; UNION PORTLAND CEMENT COMPANY, a Corporation, Cross-complainant and Appellant.

[237 Pac. 427.]

DEED—ABSOLUTE ON FACE—WHEN A MORTGAGE—INTENTION OF PARTIES —OPTION TO PURCHASE—DEBT ESSENTIAL TO EXISTENCE OF MORTGAGE—BURDEN OF PROOF.

1. Deed sought to be decreed a mortgage considered with agreement and *held* to constitute an absolute conveyance with option to purchase.

2. Where one asserts that a deed shall be given a different construction from that clearly appearing on its face, claiming that it is a mortgage, he must show by clear and convincing evidence

that a mortgage and not a sale with the right to repurchase was intended.

3. Before a deed can be declared a mortgage, there must exist a debt which must be personal in its nature and enforceable against the parties independent of the security. Record examined and *held* that no debt existed.

4. Whether a transaction evidenced by an absolute conveyance will be held to be a sale or only a mortgage must be determined by a consideration of the peculiar circumstances of each case. The intention of the parties is the only true and infallible test; this intention to be gathered from the circumstances attending the transaction and the conduct of the parties, as well as from the face of the written instruments.

5. Evidence examined and found to be ample to support the finding of the trial court that the parties intended the agreement to be an absolute conveyance with option to repurchase, and not a mortgage.

6. Where there is substantial competent evidence to support the findings and judgment of the lower court the same will not be disturbed on appeal.

APPEAL from the District Court of the Third Judicial District, for Ada County. Hon. Raymond L. Givens, Judge.

Action to declare a deed a mortgage. Judgment for defendant, Utah Construction Company. *Affirmed.*

Richards & Haga and Henderson & Johnson, for Appellants.

Contracts must be interpreted in the light of conditions as they existed at the time they were entered into. The primary object of construction in contract law is to discover the intention of the parties, as it existed at the time the contract was made. (4 Page on Contracts, secs. 2021, 2023, 2039; *Kee v. Satterfield,* 46 Okl. 660, 149 Pac. 243; *O'Brien v. Miller,* 168 U. S. 287, 297, 18 Sup. Ct. 140, 42 L. ed. 469, 473; *Boardman v. Reed,* 6 Pet. (U. S.) 328, 8 L. ed. 415; *Chesapeake & O. Canal Co. v. Hill,* 15 Wall. (U. S.) 94, 21 L. ed. 64.)

The court will place itself in the position of the parties who made the contract as nearly as can be done, without resorting to evidence of their intention direct. (*Schurger v.*

*Moorman,* 20 Ida. 97, Ann. Cas. 1912D, 1114, 117 Pac. 122, 36 L. R. A., N. S., 313; 4 Page on Contracts, sec. 2060.)

Property transferred to insure the performance of an act is not held in fee simple, but the conveyance is deemed a mortgage and must be foreclosed. (C. S., sec. 6358.)

The fact that there may not be an absolute agreement to repay the money is immaterial. (*Babcock v. Wyman,* 19 How. (U. S.) 289, 15 L. ed. 644; *Conway v. Alexander,* 7 Cranch (U. S.), 218, 3 L. ed. 321.)

When there is an absolute conveyance by one to the other, and simultaneously a condition of defeasance delivered by the latter to the former, the court will incline to the construction that the contract was a mortgage, rather than a conditional sale. (*Edrington v. Harper,* 3 J. J. Marsh (Ky.) 353, 20 Am. Dec. 145; *Keithley v. Wood,* 151 Ill. 566, 42 Am. St. 265, 38 N. W. 149; *Jeffreys v. Charlton,* 72 N. J. Eq. 340, 65 Atl. 711; *Crane v. Bonnell,* 2 N. J. Eq. 264; *Russell v. Southard,* 12 How. (U. S.) 139, 13 L. ed. 927.)

"Courts of equity are not favorable to conditional sales, and if it be doubtful whether the transaction was a conditional sale or a mortgage, the courts will incline to hold that the agreement was intended to be a mortgage." (*Freedman v. Avery,* 89 Conn. 439, 94 Atl. 969; *Peagler v. Stabler,* 91 Ala. 308, 9 So. 157.)

If the conveyance on its face is absolute, then the party asserting that it was intended as security only assumes the burden of showing such fact by clear and satisfactory proof, but once a contemporaneous agreement to reconvey is established, the rule is immediately shifted and the presumption arises that a mortgage was intended. (*Murray v. Butte-Monitor Tunnel Mining Co.,* 41 Mont. 449, 110 Pac. 497, 112 Pac. 1132; 1 Jones on Mortgages, 7th ed., sec. 279; 8 Ency. Ev. 718, and cases there cited.)

Where the deed and defeasance are of the same date and executed at the same meeting of the parties, before the same witnesses there must be a mortgage. (*Hickox v. Lowe,* 10 Cal. 197; *Kelly v. Leachman,* 3 Ida. 392, 29 Pac. 849; *Johansen v. Looney,* 31 Ida. 754, 176 Pac. 778.)

In order to declare a deed a mortgage, it is not essential that there should be any promise of the mortgagor to pay the debt. (*Evans v. Holdman,* 244 Ill. 596, 91 N. E. 723; *Joliet v. Alexander,* 194 Ill. 457, 62 N. E. 861.)

The fact that the grantors or some of them may have thought it was an absolute sale and that they forfeited their right to redeem by not paying the money within the time fixed by the contract of June 17, 1914, is immaterial. (*Russel v. Southard, supra; Johansen v. Looney, supra.*)

Marshall, McMillan & Crow and Edwin Snow, for Respondent Utah Construction Co.

The rule that a decision of a trial court will not be disturbed when there is substantial evidence to uphold it (C. S., sec. 7170) applies to suits in equity as well as actions at law. (*Panhandle Lumber Co. v. Rancour,* 24 Ida. 603, 135 Pac. 558; *Snowy Peak etc. M. Co. v. Tamarack etc. M. Co.,* 17 Ida. 630, 107 Pac. 60; *Darry v. Cox,* 28 Ida. 519, 155 Pac. 660; *Jensen v. Bumgarner,* 28 Ida. 706, 156 Pac. 114; *Jones v. Vanausdeln,* 28 Ida. 743, 156 Pac. 615.)

There was no debt. In order that such a transaction shall be a mortgage it is necessary that there be a debt and the deed be given as security for the payment thereof. The mortgage is an incident to the debt. (*Winters v. Swift,* 2 Ida. 61, 72, 3 Pac. 15; *Felland v. Vollmer,* 6 Ida. 120, 53 Pac. 268; *Shaner v. Rathdrum State Bank,* 29 Ida. 576, 161 Pac. 90; 1 Jones on Mortgages, 7th ed., sec. 265, pp. 244, 245; 3 Pomeroy's Equity, 3d ed., sec. 1196, p. 2378; 27 Cyc. 1003, 1008.)

One asserting that a deed is a mortgage must prove clearly and satisfactorily that the instrument was signed and delivered as security for a debt and not a conveyance of absolute title. (*Bergen v. Johnson,* 21 Ida. 619, 123 Pac. 484; *Shaner v. Rathdrum State Bank,* 29 Ida. 576, 161 Pac. 90; 3 Pomeroy's Equity, 3d ed., sec. 1196; 1 Jones on Mortgages, 7th ed., sec. 279a.)

And this rule applies where the deed is accompanied by a written agreement giving the grantor the right to repurchase. (*Shaner v. Rathdrum State Bank, supra.*)

"In order to convert a deed absolute in its terms into a mortgage, it is necessary that the understanding and intention of both parties, grantee as well as grantor, to that effect should be concurrent and the same." (27 Cyc. 1007, cited with approval in *Bergen v. Johnson,* 21 Ida. 619, 123 Pac. 484; *West v. Hendrix,* 28 Ala. 226; *Chapman v. Hughes,* 14 Ala. 218; *Holmes v. Fresh,* 9 Mo. 201.)

The fact that the grantee took possession of and improved the property is evidence that the intention was not to create a mortgage. (27 Cyc. 1015.)

Evidence that the conveyance originated in an application for a loan, which was declined, indicates that the transaction was not a mortgage. (*Douglas v. Moody,* 80 Ala. 61.)

Evidence that the grantee refused to take a mortgage shows that his deed accompanied by his agreement to resell was not intended merely as a mortgage. (27 Cyc. 1012.)

Evidence as to whether the negotiations preceding the transaction had to do with a sale or a loan reflect the intention of the parties. (*Pierce v. Traver,* 13 Nev. 526; *Cake v. Shull,* 45 N. J. Eq. 208, 16 Atl. 434; *Watkins v. Williams,* 123 N. C. 170, 31 S. E. 388; *Williams v. McManus,* 90 S. C. 490, 73 S. E. 1038; *Dignan v. Moore,* 8 Wash. 312, 36 Pac. 146; *Emery v. Lowe,* 140 Cal. 379, 73 Pac. 981.)

Whenever a principal has placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in assuming that such an agent is authorized to perform, in behalf of his principal, the particular act, and such particular act has been performed, the principal is estopped from denying the agent's authority to perform it. (*Alabama Great So. R. Co. v. South. etc. R. Co.,* 84 Ala. 570, 5 Am. St. 401, 3 So. 286; *Morgan v. Neal,* 7 Ida. 629, 97 Am. St. 264, 65 Pac. 66; *Union Stockyards Co. v. Mallary,* 157 Ill. 554, 48 Am. St. 341, 41 N. E. 888; *Adams Express Co. v. Carnahan,* 29 Ind. App. 606, 94 Am. St. 279, 63 N. E.

245, 64 N. E. 647; *Saultus v. Everett,* 20 Wend. (N. Y.) 267, 32 Am. Dec. 541; *Hannon v. Siegel-Cooper Co.,* 167 N. Y. 244, 60 N. E. 597; *General Cartage etc. Co. v. Cox,* 74 Ohio St. 284, 113 Am. St. 959, 78 N. E. 371; *Nicholas v. Title etc. Co.,* 79 Or. 226, Ann. Cas. 1917A, 1149, 154 Pac. 391.)

By failing to begin and prosecute their suit and permitting defendant to assume the risk on a speculative enterprise, plaintiffs have become estopped by their laches. The speculative character of the property involved is an important element in considering the effect of delay in asserting a right thereto and more than ordinary promptness must be displayed to avoid the charge of laches in such cases. (16 Cyc. 161; *Johnston v. Standard Min. Co.,* 148 U. S. 360, 13 Sup. Ct. 585, 37 L. ed. 480, 17 Morr. Min. Rep. 554; *Jones Min. Co. v. Cardiff Min. & Mill. Co.,* 56 Utah, 449, 191 Pac. 426; *Twin Lick Co. v. Marbury,* 91 U. S. 587, 23 L. ed. 328; *Burkle v. Levy,* 70 Cal. 250, 11 Pac. 643; *Hill v. Finnigan,* 77 Cal. 267, 11 Am. St. 279, 19 Pac. 494; *Attwood v. Small,* 6 Clark & F. (Eng.) 356; *Sunny Brook Zinc etc. Co. v. Metzler,* 231 Fed. 304; *Jackson v. Jackson,* 175 Fed. 710, 99 C. C. A. 286.)

"A receiver is regarded as occupying a fiduciary relation, in the sense that he will not be allowed to purchase for his own benefit property connected with or forming a part of the subject-matter of his receivership, or in his possession in that capacity." (3 High on Receivers, 3d ed., sec. 193; *McConnel v. Gibson,* 12 Ill. 128; *Winans v. Winans,* 22 W. Va. 678; *Ayers v. Blair,* 26 W. Va. 558; 24 Cyc. 29; 13 C. J. 415, 418, 492–496.)

BUDGE, J.—This action was brought to have a deed declared a mortgage. For convenience and brevity appellants James E. Clinton and H. H. Henderson will be hereinafter referred to as plaintiffs, appellant Union Portland Cement Company as cross-complainant, respondent, Utah Construction Company as defendant, and Corey Brothers Construction Company as Corey Bros.

The complaint alleges the corporate existence of defendant and cross-complainant and that Corey Bros. was a Utah corporation authorized to do business in Idaho until the forfeiture of its charter on December 2, 1916, for failure to pay its annual license tax; and at the time of such forfeiture W. W. Corey, W. E. Corey, O. O. Corey and A. T. Corey constituted its board of directors and W. W. Corey was and now is its president and general manager. It is then alleged that Corey Bros., W. W. Corey, O. O. Corey, W. E. Corey and A. T. Corcy and cross-complainant declined to join with plaintiffs in this action and are therefore made defendants; that on December 27, 1912, the United States district court of the district of Idaho entered a final decree in a case then pending before it, in which Corey Bros. was plaintiff and the Big Lost River Irrigation Co. and others were defendants, and Union Portland Cement Co. intervenor; that the action involved the foreclosure of a mechanic's and materialman's lien and the property covered by such liens consisted of an irrigation system known as the Big Lost River Irrigation Project; that by said final decree judgment was rendered against the Big Lost River Irrigation Company in favor of Corey Bros. in the sum of approximately $610,000 and attorney's fees in the sum of $16,000 (plaintiff H. H. Henderson being attorney for Corey Bros. in the action), and judgment was also rendered against the Big Lost River Irrigation Company in favor of cross-complainant herein in the sum of approximately $17,000 including attorney's fees, and the property was ordered sold to satisfy such judgments; that on April 4, 1914, the property was sold at master's sale and was bid in by Ralph E. Hoag as trustee for and for the benefit of Corey Bros., plaintiffs and cross-complainant, for the sum of $35,000, and it was agreed between Hoag, as trustee, and the beneficiaries that the respective interests of the beneficiaries in the property should be as follows: That plaintiff, James E. Clinton, owned an undivided one-sixth interest, plaintiff H. H. Henderson owned an undivided fifteen one-hundredths interest, cross-complainant owned an interest equal to the proportion that its judgment would

bear to the aggregate judgments of itself and Corey Bros., and Corey Bros. owned the remaining interest. It is then alleged that for a period of approximately a year prior to the master's sale on April 4, 1914, defendant had been negotiating with plaintiffs, cross-complainant and Corey Bros. for the purchase of the property covered by the decree in the event they or either of them should become the purchasers at the master's sale, and with such purchase in view defendant had investigated and examined the property; that on January 26, 1914, defendant made an offer to Corey Bros. by letter to purchase the property upon the following terms: Defendant to pay $350,000 for what is known as the Corey Bros. judgment and when the sale is completed defendant to pay $8,500 for Henderson's attorney fee, and defendant to take care of the receiver's certificates. This offer was made with the understanding that defendant was to have a reasonable length of time to enable it to make necessary negotiations for the building of a branch line through one of the tracts and that defendant would be in no way bound to take up its offer unless it was able to make satisfactory negotiations with cross-complainant and any other claims that might be at issue. It is next alleged that on or about June 1, 1914, defendant informed the owners of the property that it would not purchase the same under the terms of the offer of January 26, 1914, but proposed to them that if, after further investigation, it elected to purchase the property it would pay therefor $200,000, such sum to be paid to Hoag, Corey Bros. and plaintiffs according to their respective interests, and defendant would settle the claim of cross-complainant; that while plaintiffs believed the amount offered to be wholly inadequate and far less than the real value of the property, they joined with Corey Bros. and cross-complainant in accepting said offer; that these negotiations were conducted by W. H. Wattis as president and general manager of defendant, W. W. Corey as president and general manager of Corey Bros., by plaintiffs individually, and by H. H. Henderson, representing the cross-complainant; that at all times W. H. Wattis knew that Hoag did not personally have any

interest in the property but knew that he was president and general manager of both the Utah National Bank of Ogden and the Evona Investment Company, which institutions were large creditors of Corey Bros. It is further alleged that prior to the date of the master's sale, April 4, 1914, Corey Bros. assigned its judgment to Hoag, which assignment was made so that Hoag might bid the property in at the master's sale for the benefit of the owners and to enable him to apply said judgment in payment of the purchase price on any bid that he might make in excess of $35,000; that Hoag was authorized by the owners to bid in their behalf not to exceed $400,000 to secure the property; that about June 1, 1914, defendant, as part of its offer of $200,000 for the property, agreed to advance the $35,000 necessary to purchase the property at the sale and to accept an assignment of Hoag's bid as security and defendant, on July 7, 1914, advanced such sum and received such assignment; that on July 14, 1914, the sale was confirmed in the name of defendant and the court ordered the special master to execute a deed conveying the property to defendant, which deed was made by the special master and was accepted by defendant as security for the $35,000 advanced; that the special master's deed was filed for record on December 27, 1915, in Blaine county. It is next alleged that as part of the offer of $200,000 of June 1, 1914, defendant was to have six months in which to complete its examination of the property, and if at the end of that time it concluded to purchase, it should pay the balance, $165,000, and settle the claim of the cross-complainant, and if it did not desire to purchase the property at that time, it should notify the owners, who would thereupon repay, within sixty days after such notification, without interest, the $35,000 advanced; that about January 1, 1915, defendant notified Hoag that it did not desire to proceed with the purchase and requested payment of the $35,000 within sixty days, but it did not notify W. W. Corey or either of the plaintiffs of its refusal to proceed; that W. H. Wattis is a nephew of W. W. Corey; that W. E. Corey, O. O. Corey and A. T. Corey are sons of W. W. Corey; that on March 1, 1915,

W. H. Wattis, as president of defendant, in a letter to Hoag, informed the latter that the time for redemption expired on February 26, 1915, and that on account of Hoag's failure to exercise the option to repurchase, title to the property passed to defendant, but that through a desire to assist Corey Bros. and Hoag defendant still recognized the interest of Hoag and his associates to the amount of $50,000, which was to be paid in water contracts obtained from settlers on the project, but that if such water contracts were not made, defendant should not be held liable; that the terms of this letter were accepted by Hoag by indorsement thereon. On information and belief it is alleged that on March 1, 1915, Corey Bros., W. W. Corey, W. E. Corey, O. O. Corey and A. T. Corey were indebted to the Utah National Bank and Evona Investment Company in the approximate sum of $80,000, as makers or indorsers of notes; that prior to that time, for the purpose of specially benefiting Corey Bros., the Utah National Bank, Evona Investment Company and Ralph E. Hoag, personally, to the general benefit of W. W. Corey, W. E. Corey, O. O. Corey and A. T. Corey and to the detriment of plaintiffs and creditors of Corey Bros. not represented by Hoag, an agreement was made between W. H. Wattis, W. W. Corey and Ralph E. Hoag without the knowledge or consent of plaintiffs, whereby it was agreed that the notes of Corey Bros., W. W. Corey, W. E. Corey, O. O. Corey and A. T. Corey held by the Utah National Bank and certain of the notes of those parties held by Evona Investment Company should be canceled and delivered up, and further, that a chattel mortgage on all the personal property of Corey Bros., given to secure the remaining notes of those parties, held by Evona Investment Company, should be foreclosed and the property bid in by the mortgagee and after acquisition of title the property should be distributed to the aforesaid stockholders and directors of Corey Bros., the terms of which agreement were carried out. It is furthed alleged on information and belief that on March 1, 1915, Corey Bros. were wholly insolvent and its assets, other than its interests in the Big Lost River Irrigation Company judgment, were

only sufficient to pay about seven per cent of its outstanding indebtedness; that it was the purpose and intention of Wattis and Hoag that the water contracts aforesaid should be received from defendant for the benefit of the Utah National Bank and Evona Investment Company and that these two institutions and Hoag personally would be greatly benefited by receiving such water contracts in lieu of the notes of Corey Bros. and the Coreys heretofore referred to; that about March 1, 1915, Wattis and Hoag entered into a secret agreement whereby defendant was to deliver to Hoag additional water contracts aggregating $20,000; that the resulting aggregate of $70,000 of water contracts which defendant agreed to deliver to Hoag were intended to be a part of the consideration to be paid for the property under the agreement of June 1, 1914. On information and belief it is further alleged that defendant has settled or agreed to settle the claim of cross-complainant for one-half of its face value; and that defendant, through Wattis, prior to March 1, 1915, agreed to pay W. W. Corey, individually, $40,000 for his assistance in helping defendant to acquire the project without being compelled to pay plaintiffs for their interest in the property under the agreement of June 1, 1914, and that about $23,868 had been paid by defendant to W. W. Corey. The complaint then alleges that the acts of Wattis and Hoag as aforesaid were done to defraud plaintiffs and other creditors of Corey Bros. and to enable defendant to acquire the property without paying the full price under the agreement of June 1, 1914, and without paying plaintiffs anything whatsoever for their interest in the property, in order to specially benefit the Utah National Bank and Evona Investment Company and Ralph E. Hoag, personally; that defendant knew that Hoag had no authority, as trustee or otherwise, to accept the terms of the letter of March 1, 1915, from Wattis to Hoag, theretofore referred to, or to contract with Wattis or defendant for acquiring or transferring title to the property on other terms than as contained in the agreement of June 1, 1914; that the Big Lost River Irrigation project is situated in Custer, Bingham, Blaine and Fremont

counties and consisted on June 1, 1914, of a large reservoir and dam, sometimes known as the Mackay Dam, more than 200 miles of ditches and laterals, water right, water appropriations and rights of way, and on information and belief it is alleged that at that time upward of $1,500,000 had been expended in the construction of the project and in the acquisition of these rights, and on December 27, 1912, the project was and ever since has been of the value of $500,000. It is then alleged that plaintiffs have received nothing from the defendant for their interest in the property and that defendant is attempting to appropriate all of the property, including the interest of plaintiffs, to its own use without paying plaintiffs for their interest therein; that the deed to defendant, although in form a deed, is in fact a mortgage and was intended to be given as security for the $35,000 advanced; that defendant has taken no steps to foreclose the same and no demand has been made by defendant upon plaintiffs or Corey Bros. for the payment of such sum or any part thereof; that Clinton did not know of the letter from Wattis to Hoag, of date March 1, 1915, until along in 1916, and did not know of the cancelation of the notes held by the Utah National Bank and Evona Investment Co. and the delivery of such notes to Corey Bros. and its directors until 1918; that he did not know until the middle of 1918 that W. W. Corey was to receive the $40,000 aforesaid for assisting defendant in acquiring the property; that plaintiff Henderson did not know of the letter of March 1, 1915, from Wattis to Hoag until long thereafter; that he did not know of the cancelation of the notes until the beginning of 1917; that he did not know that W. W. Corey was to receive $40,000 for assisting defendant in acquiring the property until the summer of 1918; that when the agreement of June 1, 1914, was entered into plaintiffs knew that defendant was possessed of large financial means, had extended experience in contracting and construction business and was well equipped to complete the system at a much less cost than other parties; and plaintiffs believed that defendant and Wattis were acting in good faith and intended to carry out the agreement

and purchase the property for $200,000, less the $35,000 advanced, in accordance with the agreement of June 1, 1914; that defendant is in possession of the property and operating the same to its own use and benefit and declines to reconvey the same to the plaintiffs or the owners upon payment of $35,000. A complete description of the property as contained in the master's deed is then set forth. Plaintiffs pray to have the master's deed decreed to be a mortgage and intended only as security for the $35,000 advanced by defendant and that defendant be required to release said mortgage and reconvey the property to plaintiffs, Corey Bros. and cross-complainant, as their interests may appear, upon the payment of $35,000.

A separate answer was filed by defendant. Therein the material allegations of the complaint are denied, except as hereinafter noted, defendant relying upon the master's deed and an agreement made between himself and Hoag, as trustee for plaintiffs, Corey Bros. and cross-complainant, dated June 17, 1914, a copy of which agreement is as follows:

## "AGREEMENT.

"This Agreement made and entered into this 17th day of June, 1914, by and between Ralph E. Hoag of Ogden, Utah, hereinafter designated as first party and The Utah Construction Company, a corporation of Utah, hereinafter designated as second party.

"Witnesseth: That for and in consideration of the sum of thirty-five thousand dollars ($35,000) in hand paid to said first party by said second party, the said first party hereby sells, assigns, sets over and transfers unto said second party, its successors and assigns, all of the rights, title and interest acquired or hereafter to be acquired by said first party as purchaser at the sale by the special master appointed by the District Court of the United States in and for the District of Idaho in the suit of Corey Bros. Construction Company, a corporation, as plaintiff, v. Big Lost River Irrigation Company and others as defendants, and Union Portland Cement Company, a corporation, intervenor,

including all the real estate, reservoirs, dams, canals, ditches, laterals, head-gates, coulees, draws, flumes, rights of way and of flowage, easements, permits, privileges, and franchises for dams, reservoirs, canals, ditches, and laterals, and, in general, the entire irrigation works, project and system in Blaine, Bingham, Custer and Fremont Counties, State of Idaho, consisting of about two hundred miles of main and lateral canals and ditches, commonly known as the Big Lost River Irrigation System, together with all franchises and powers, privileges and appurtenances connected therewith, and all other rights, legal or equitable acquired by said first party at said sale.

"It is further mutually understood and agreed between the parties hereto that the said second party shall have six months from and after the date of this contract within which to determine, in its sole discretion, as to whether or not said second party can contract with the State Board of Land Commissioners of the State of Idaho, for the completion of the project hereby purchased, upon terms and conditions satisfactory to said second party, and also to determine in its sole discretion as to whether or not said second party can enter into new contracts with the settlers and other persons who have heretofore entered into contracts with the Big Lost River Land and Water Company for the purchase of water rights from the said Big Lost River Land and Water Company upon such terms and conditions as will be satisfactory to said second party. Said second party shall also have the same period of time within which to determine in its sole discretion as to whether or not it can settle the judgment of the Union Portland Cement Company provided for in the decree hereinbefore referred to, upon such terms and conditions as will be satisfactory to said second party.

"It is further understood and agreed that if at any time within said period of six months said second party shall determine in its sole discretion that it does not desire to complete said project or to proceed further in connection therewith, it shall thereupon notify said first party thereof, and within sixty days after said first party has been notified,

said first party will purchase the property herein mentioned
and pay to said second party therefor, within said period of
sixty days, the sum of thirty five thousand dollars ($35,000.).
In case of the failure of said first party to purchase said
property and pay therefor as herein provided (and as to this
provision, time is of the essence of the contract), all rights
of said first party under this contract shall be terminated and
ended and the said second party shall retain all of the prop-
erty hereinbefore mentioned.

"It is further understood and agreed that if said first
party shall elect to purchase said property under the terms
and conditions hereinbefore mentioned and to pay the pur-
chase price therefor as hereinbefore provided, the said sec-
ond party upon receiving said payment shall make, execute
and deliver to said first party, his executors, administrators
or assigns, all of the right, title and interest that said pur-
chaser has in and to said property at the time said purchase
price is paid.

"It is further mutually understood and agreed that in the
event that, within said period of six months, said second
party, its successors or assigns, shall elect to complete said
project, it will thereupon pay to said first party the addi-
tional sum of one hundred sixty five thousand dollars
($165,000) as follows: Sixty five thousand dollars ($65,000)
in cash and one hundred thousand dollars ($100,000) in
bonds at par and without accrued interest, of the Oakdale
Irrigation District of Stanislaus County, California.

"In Witness Whereof the said first party has hereunto
set his hand this 17th day of June, 1914, and the said second
party has caused its name to be subscribed hereto by W. H.
Wattis, its president, thereunto duly authorized.

"RALPH E. HOAG.

"THE UTAH CONSTRUCTION COMPANY.

"By W. H. WATTIS, President."

Defendant, in its answer, denied among other things, the
alleged agreement entered into about April 4, 1914, as to
the interests of the various parties in the property and al-
leges that the various offers alleged in the complaint prior to

40 Idaho—43

June 17, 1914, were only tentative suggestions culminating in and qualified by the agreement of June 17, 1914, set forth above. The alleged conspiracy to defraud plaintiffs and the creditors of Corey Bros. is specifically denied. It is alleged that in the various dealings had between defendant, its president, W. H. Wattis, and Hoag, the latter acted as the agent and trustee of all the owners of the property and in their behalf, with their knowledge and acquiescence, and had full power so to do. The alleged agreement for settlement with the cross-complainant on the basis of fifty per cent of its claim is admitted, but defendant denied that the deed was ever a mortgage or was intended to be given as security for the payment of $35,000 and alleges the same to be a deed absolute and a conveyance in fee simple.

Further answering, defendant alleged that plaintiff James E. Clinton was special master appointed by the United States district court; that at the master's sale Hoag became the purchaser of the property, having bid $35,000 therefor, paying in cash at the time of the sale $3,500; that on June 17, 1914, Hoag and defendant entered into the agreement hereinbefore set forth, whereby the former assigned to defendant all of his rights as purchaser at the master's sale; that on June 17, 1914, the property consisted of a partially developed irrigation system which had been partially constructed under the act of Congress commonly known as the Carey Act and certain laws of the state of Idaho adopted pursuant thereto; that because of the insolvency of the Big Lost River Irrigation Company, the owner of the same, and its inability to complete the system as required by the act of Congress and the laws of the state of Idaho aforesaid, and the rules and regulations adopted thereunder, the property was without value and could not be made valuable without the expenditure of a large sum of money; that it was extremely doubtful whether such expenditure would give it a potential value and this was only determinable upon such expenditure and development work covering a period of years; that after the delivery of the master's deed and within the time provided in the above agreement of June 17, 1914,

and in accordance therewith, defendant made an investigation and determined that it could not contract upon satisfactory terms with the state board of land commissioners for the completion of the project, and could not make satisfactory terms with the settlers who had contracted with the Big Lost River Irrigation Company, also that it could not settle the judgment of cross-complainant upon satisfactory terms; that after such investigation defendant concluded not to proceed with the construction of the project and on December 12, 1914, so notified Hoag; that defendant thereafter, for a long period of time in excess of that provided for in the agreement of June 17, 1914, stood ready and willing to convey the property to Hoag, upon payment of the purchase price, but the same was not paid; that thereafter defendant entered upon the partial construction of the project as originally contemplated, and in order to secure the goodwill and assistance of W. W. Corey, W. E. Corey, O. O. Corey, A. T. Corey, Ralph D. Roberts, A. G. Gallagher, W. F. Gallagher and F. D. Higginbotham, defendant paid the sum of $23,864, which was distributed among them; that defendant agreed to deliver to Hoag settlers' contracts not to exceed $70,000 in instalments proportionate to the total acreage eventually to be supplied with water, up to 60,000 acres, such contracts to be delivered to Hoag *pro rata* in the proportion that the acreage for which water was therein provided, would bear to the 60,000 acres; that after March 1, 1915, defendant ascertained that it was impracticable to carry out the project as originally contemplated and determined to abandon the same rather than attempt to do so; that on December 27, 1915, the agreement for the delivery to Hoag of settlers' contracts aggregating $70,000 was modified by the parties, by correspondence, so that such contracts should be furnished as the water was supplied to certain units under the project; that after such modification and the payment of the $23,864 to W. W. Corey and others as aforesaid, defendant, with the knowledge and acquiescence of plaintiffs, commenced the construction of certain units of the project and has since diligently proceeded with such work and has

expended considerable money thereon; that defendant has derived no profit and no considerable income from the enterprise and it is still impossible to determine whether the undertaking will be financially successful; that this work was done and the expenditures made by defendant with the understanding and belief that plaintiffs were fully satisfied with the terms of the final agreements between defendant and Hoag, and that Hoag had full power to make the same, all of which plaintiffs at all times well knew; that it was not until 1919, long after such expenditures, that plaintiffs made any of the claims now asserted or notified defendant of the alleged want of power of Hoag, and that plaintiffs ought to be estopped and are barred by their acquiescence and laches from asserting such claims or demands.

By leave of court, defendant was later permitted to file an amendment to its answer, wherein it is alleged that after the purchase of the property by Hoag at the master's sale the special master filed his report of such sale; that thereafter, on July 2, 1914, a petition was filed by Corey Bros., cross-complainant, and Hoag in the United States district court, in the case heretofore mentioned, setting forth the special master's report of sale, also the transfer to defendant of all of Hoag's rights as purchaser at such sale, and praying that the sale be made absolute upon payment of $35,000 and that the special master be authorized to execute a conveyance to defendant; that such petition was signed by plaintiff Henderson on behalf of both Corey Bros. and cross-complainant and by Hoag in person; that upon the hearing of the petition on July 14, 1914, the court confirmed the sale and authorized and ordered the execution of the special master's deed to defendant and awarded deficiency judgments against the Big Lost River Irrigation Company and in favor of Corey Bros. and cross-complainant in the amounts of $565,559.87 and $17,902.85, respectively, which judgments have never been modified and have become final; that at the time plaintiff Clinton claims to have acquired an interest in the property he was receiver in charge of the property of the Big Lost River Irrigation Company, appointed by the

United States district court for the district of Idaho in the action heretofore mentioned, and an officer of the court; that as such officer he was incompetent to acquire any right, title or interest in the property and any interest so acquired is against public policy, illegal and in fraud of the creditors and stockholders of Big Lost River Irrigation Company and void and unenforceable; that the same is true of any agreement made by Clinton while acting as special master, for or relating to an interest in the property, with the purchaser at the sale or his assignee; that prior to the time plaintiffs claim to have acquired such interest in the property from Corey Bros. the latter assigned and transferred all of its right, title and interest in the property and to the judgment recovered by it in the case aforesaid to Ralph E. Hoag, as agent for the Utah National Bank of Ogden, John E. Dooly and Evona Investment Company, to whom Corey Bros. were indebted; that prior to the time plaintiffs claim to have acquired an interest in the property, Corey Bros., for a valuable consideration, assigned and transferred to the Utah National Bank of Ogden and John E. Dooly all indebtedness due Corey Bros. from the Big Lost River Irrigation Company and all mechanics' liens filed to secure the same, and all lawsuits pending or thereafter instituted to enforce such claims for indebtedness and mechanics' liens; that Ralph E. Hoag, in entering into the agreements for the sale of the property to defendant, under which defendant purchased the property, was acting as agent for the Utah National Bank, John E. Dooly, Evona Investment Company and Corey Bros. and had full right to transfer the property to this defendant free and clear of any claim, title or interest of plaintiffs to the property; that the large expenditure to complete the project was made by defendant under the belief that it had good title thereto; that but for such expenditure the property would have deteriorated so that the same would have become valueless and the title thereto lost; that by such expenditures, which were for permanent improvements, the value of the property has been increased in a sum far in excess of the amount expended.

An answer and cross-complaint was filed by cross-complainant. The answer admits all the allegations of the complaint, except that it is alleged that the facts of the case were only fully understood by cross-complainant's president a few days prior to the filing of the answer and its attorneys were ordered to join with plaintiffs in the action. It is also alleged that defendant agreed to pay cross-complainant one-half of its claim but has not done so. The cross-complaint adopts *in toto* the allegations of the complaint, except that it is alleged that cross-complainant did not know of the letter from Wattis to Hoag, dated March 1, 1915, until along in 1916; that it did not know of the cancelation of the notes of the Utah National Bank and Evona Investment Company until the middle of the year 1918, and that it did not know until the middle of the year 1918 that W. W. Corey was to receive $40,000 from defendant for his assistance in acquiring the property.

The defendants, Corey Bros., W. W. Corey, W. E. Corey, O. O. Corey and A. T. Corey, failed to appear and answer. Upon the issues thus framed the cause was tried to the court sitting without a jury. Findings of fact were made by the court which substantially support the allegations of defendant's answers and affirmative defenses. From such findings the court concluded as a matter of law: (1) that the master's deed of July 30, 1914, was a deed absolute; (2) that the agreement of June 17, 1914, does not constitute the master's deed a mortgage or modify or in any manner affect the title therein conveyed; (3) that plaintiffs nor cross-complainant nor Corey Bros. own any right, title or interest in the property; (4) that plaintiffs and cross-complainant have been guilty of laches and are estopped from claiming any interest in the property, and (5) that the complaint and cross-complaint should be dismissed.

Judgment was thereafter entered dismissing the complaint and cross-complaint. Plaintiffs and cross-complainant thereafter made a motion for new trial which was overruled. From the judgment and from the order overruling the motion for new trial plaintiffs and cross-complainant appeal.

Numerous assignments of error are specified and relied upon by appellants. To discuss each of them would require an opinion of such length as in our minds would not be warranted, especially in view of the conclusions reached. If the court's first and second conclusions of law are supported by the findings, and such findings are warranted and supported by the evidence, to our minds the rights of the parties may be determined therefrom and all other questions become incidental to the main point in controversy. The conclusions of law to which we have reference read as follows:

"1. That the Master's Deed dated July 30, 1914, and executed and delivered by James E. Clinton, Master in Chancery, to the Utah Construction Company, was a deed absolute and not a mortgage, and conveyed absolutely all title which the said Master in Chancery was able to convey to the Utah Construction Company.

"2. That the said agreement of June 17, 1914, does not, either taken by itself or taken in connection with the oral understandings and agreement of the parties, constitute the said Master's Deed a mortgage or modify or in any manner affect the title therein conveyed."

We will first determine whether the master's deed, standing alone, constituted a mortgage or was a deed absolute. That instrument, after reciting the proceedings had prior to the master's sale, sets forth the purchase of the property at such sale by Ralph E. Hoag, the highest bidder thereat, for $35,000, the initial payment of $3,500 on such purchase price by Hoag, the transfer and assignment by Hoag to defendant of all of his rights to the property, the payment of the balance of the purchase price and the confirmation of the sale in defendant. The deed then recites that James E. Clinton, special master, has "granted, bargained, sold, transferred, conveyed, released and set over, and by these presents do grant, bargain, sell, transfer, convey, release and set over unto said The Utah Construction Company, party of the second part, in fee simple, all the right, title and equity of redemption of the Big Lost River Irrigation Company, and of

every other party in the above named suit, and of every person or persons claiming through or under any of said parties, of, in and to all and singular the property, lands, rights and franchises in and by said decree ordered to be sold, to-wit."

Then follows a particular description of the property. No defeasance clause appears in the deed. It constituted an unqualified transfer of the property and was, upon its face, an absolute conveyance, in fee simple, to defendant, of all of the property covered by the decree, namely, all of the property of whatever kind or nature formerly owned or acquired by the Big Lost River Irrigation Company in connection with the Big Lost River Irrigation Project.

The question then arises as to whether or not the agreement of June 17, 1914, heretofore set forth in full, had the effect of modifying the master's deed so as to make it a mortgage. In our determination of this question we are governed by the doctrine announced by this court in the case of *Shaner v. Rathdrum State Bank*, 29 Ida. 576, 161 Pac. 90, as follows:

"It is a well-settled rule that where one asserts that a deed, absolute on its face, with the conditional contract to repurchase within a certain date, is simply a mortgage given as security for the payment of a debt, he must show by clear and convincing evidence that it was intended as a mortgage and not as a sale."

Also in the case of *Bergen v. Johnson*, 21 Ida. 619, 123 Pac. 484:

"In an action brought for the purpose of declaring a deed a mortgage, the evidence to support the claim of the plaintiff must be clear and satisfactory and show the intent of the parties to be that the instrument delivered is security for a debt, and not a conveyance of absolute title."

Also in the case of *Emery v. Lowe*, 140 Cal. 379, 73 Pac. 981:

"A judgment decreeing a deed, which is on its face an absolute and unconditional conveyance of property, to be a mortgage, should be based on clear and satisfactory proof. Where the trial court has declared a deed absolute on its

face to be a deed, and not a mortgage, the court, on appeal, will not reverse the judgment unless the evidence is almost overwhelming the other way."

To the same effect see: *Tetenman v. Epstein,* 66 Cal. App. 745, 226 Pac. 966; *Denver Sanitarium & Hospital Assn. v. Roberts,* 65 Colo. 60, 174 Pac. 300; *Renas v. Green,* 88 Okl. 169, 212 Pac. 755; *Armstrong v. Phillips,* 82 Okl. 82, 198 Pac. 499; *Jones v. Jones,* 96 Or. 197, 189 Pac. 896; *Wiese v. Wiese,* 126 Wash. 246, 217 Pac. 994; *Foster v. Floyd,* 113 Wash. 312, 194 Pac. 407; *Boost v. Capen,* 111 Wash. 227, 190 Pac. 240; *Nutter v. Cowley Inv. Co.,* 85 Wash. 207, 147 Pac. 896; *Hoover v. Bouffleur,* 74 Wash. 382, 133 Pac. 602; *Johnson v. National Bank of Commerce,* 65 Wash. 261, 118 Pac. 21.

Hoag, by agreement of plaintiffs, cross-complainant and Corey Bros., was appointed trustee and in his official capacity represented the Utah National Bank and Evona Investment Company. He had full power to act for and bind the above-named parties in negotiations which culminated in the master's deed and also in the agreement of June 17, 1914, and in all subsequent arrangements with defendant as will be hereinafter noted.

From our analysis of the whole agreement it is clear that it was optional upon the part of defendant to determine, in its sole discretion, whether it would proceed with the completion of the project and if it determined to do so it would pay to Hoag, as trustee, an additional sum of $165,000. It was likewise within defendant's sole discretion to refuse to proceed with the completion of the project, and upon such determination it was required to notify Hoag, as trustee, of its decision and if, within sixty days after such notification, Hoag exercised his option to purchase and paid defendant $35,000, the latter was bound to convey the property to Hoag as such trustee by good and sufficient conveyance. Under the agreement, upon the failure of Hoag, as trustee, to exercise the option to purchase and make the payment of $35,000 within the stipulated time (and it will be noted that in this respect time is of the essence of the contract), defend-

ant retained the property and all rights of Hoag and the parties represented by him terminated and ended. They were under no obligation to exercise this option and no liability would attach upon their failure so to do. If they failed to exercise it all their rights terminated and they had no other claim to the property. If they did exercise it and made the specified payment they were entitled to a deed from defendant conveying the property to them. Neither Hoag, as trustee, plaintiffs, cross-complainant nor Corey Bros. owed the defendant $35,000 or any other amount under the terms of the agreement, and the master's deed was not given in payment of a pre-existing debt or to secure an existing one. No debt existing or having been created, there could be no mortgage, and no right of action accrued whereby defendant could have recovered a judgment or a deficiency judgment against any of the parties. In the case of *Winters v. Swift,* 2 Ida. 61, 72, 3 Pac. 15, this court said: "When there is no debt and no loan, an agreement to resell will not change an absolute conveyance into a mortgage." Also in the case of *Shaner v. Rathdrum State Bank, supra,* it was said: "A mortgage is an incident of the debt, and without a debt, obligation or liability there is nothing to secure, consequently there can be no mortgage."

"The principal test to be applied in determining whether a given instrument is a mortgage is whether the relation of the parties toward each other of debtor and creditor continued after the execution of the instrument." (*Coffin v. Green,* 21 Ariz. 54, 185 Pac. 361.)

"Whether a conveyance of land absolute in form which was executed at the same time as an agreement between the parties that the grantee should reconvey the land to the grantor for a specified consideration within a stated time constitutes a conveyance or only a mortgage depends upon the intention and understanding of the parties when the instruments were executed, and the controlling test is whether the grantor sustains the relation of debtor to the grantee." (*Root v. Wear,* 98 Kan. 234, 157 Pac. 1181.)

"The test of a mortgage is whether the relation of debtor and creditor continues so that there is a subsisting debt after the conveyance." (*Chapman v. Hicks,* 41 Cal. App. 158, 182 Pac. 336.)

"To determine whether a deed absolute on its face is in equity a mortgage, the test is whether a debt was created or continued for which the deed was designed as security." (*Caro v. Wollenberg,* 68 Or. 420, 136 Pac. 866.)

"Before a deed can be declared, to be an equitable mortgage, there must exist a debt which must be personal in its nature and enforceable against the person independent of the security." (*Voris v. Robbins,* 52 Okl. 671, 153 Pac. 120.)

"On an issue as to whether a deed absolute in form was intended as an absolute conveyance or as a mortgage, the test is whether there was a subsisting debt after the conveyance." (*Holmes v. Warren,* 145 Cal. 457, 78 Pac. 954.)

To the same effect see: 27 Cyc. 1008; *Henley v. Hotaling,* 41 Cal. 22; *Farmers & Merchants' Bank v. Kackley,* 88 Kan. 70, 127 Pac. 539; *Morrison v. Jones,* 31 Mont. 154, 77 Pac. 507; *Renas v. Green, supra; Young v. Evans,* 104 Or. 619, 208 Pac. 741; *Mittlesteadt v. Johnson,* 75 Wash. 550, 135 Pac. 214; *Johnson v. National Bank of Commerce, supra.*

It is clear from an examination of the agreement that there was no debt, and if an action had been brought by defendant to recover the $35,000, the defense would have been interposed that the agreement provided for an option to purchase, which might be exercised or refused and they refused to exercise it. This would have constituted a complete defense under the agreement.

Whether the master's deed and the agreement, considered together, constituted a mortgage or was a sale outright with an option to purchase, depends upon the intention of the parties. (*Winters v. Swift, supra.*) The rule in this respect is stated in 27 Cyc. 1007 in the following language:

"The question whether a deed which is absolute in form is to be taken as a mortgage depends upon the intention of the parties in regard to it at the time of its execution. . . . .

But in order to convert a deed absolute in its terms into a mortgage, it is necessary that the understanding and intention of both parties, grantee as well as grantor, to that effect should be concurrent and the same."

"Whether a transaction evidenced by an absolute conveyance will be held to be a sale or only a mortgage must be determined by a consideration of the peculiar circumstances of each case. The form of the conveyance is not conclusive. The intention of the parties is the only true and infallible test; this intention to be gathered from the circumstances attending the transaction and the conduct of the parties, as well as from the face of the written contract." (*Haynes v. Gaines,* 76 Okl. 268, 185 Pac. 74.)

"Whether an absolute deed to real estate is a mortgage or absolute conveyance depends on the intent of the parties at the time of its inception." (*Johnson v. National Bank of Commerce, supra.*)

"The intention of the parties at the time an agreement is consummated to execute a deed determines whether title to the property is to be irrevocably transferred, or the conveyance, though absolute in form, is to be merely as security for the payment of a debt or the performance of an obligation." (*Harmon v. Grants Pass Banking & Trust Co.,* 60 Or. 69, 118 Pac. 188.)

To the same effect see: *Chapman v. Hicks, supra; Robitaille v. Boulet,* 53 Mont. 66, 161 Pac. 163; *Rosebaugh v. Jacobs,* 83 Okl. 211, 201 Pac. 245; *Hall v. Russell,* 72 Okl. 47, 178 Pac. 679; *Voris v. Robbins, supra; Elliott v. Bozorth,* 52 Or. 391, 97 Pac. 632; *Hall v. O'Connell,* 52 Or. 164, 95 Pac. 717, 96 Pac. 1070; *John R. O'Reilly, Inc., v. Tillman,* 111 Wash. 594, 191 Pac. 866; *Beverly v. Davis,* 79 Wash. 537, 140 Pac. 696; *Hoover v. Bouffleur, supra; McFadden v. French,* 29 Wyo. 401, 213 Pac. 760.

This intention, as above noted, is to be ascertained from the written instruments themselves and the intention of the parties as gathered from their previous negotiations, their agreements and conversations and the course of dealings between them prior to and leading up to the execution of the

instruments and the peculiar circumstances of each case. (*Winters v. Swift, supra.*) The trial court therefore properly admitted evidence as to negotiations and agreements and conversations had prior to the execution of these instruments and subsequent dealings between the parties.

This brings us to the question of the intention of the parties as shown by their acts and conduct with respect to the instruments. It is clear from the record that the terms of the agreement were fully complied with upon the part of defendant; that within the time specified in the agreement defendant duly notified Hoag, as trustee, of its decision not to proceed with the completion of the project, and that plaintiffs, cross-complainant and Corey Bros. had actual knowledge of such notification. It is also clearly established that after the expiration of the sixty-day period as specified in the agreement, and the failure to exercise the option to purchase, two additional written extensions and an oral extension were given by defendant. No other conclusion can be drawn from the evidence than that the defendant was ready and willing to make a conveyance of the property and to receive therefor the $35,000. This is evident from the result of defendant's investigation of the property which disclosed a number of adverse reports by engineers as to the feasibility of constructing a substantial and safe dam and the defects in the work already done, its inability to make satisfactory contracts with the state land board and the settlers on the project, the defective condition of the title to the property in that a part had been sold for taxes and tax deeds had issued therefor, that a large additional expensive tract of land would have to be acquired in order to complete the project; that water permits were subject to cancelation for failure to comply with requirements as to completion of works, etc., as required under such permits; that rights under the project were subject to forfeiture by the government and the state; that by reason of the failure of Hoag, as trustee, plaintiffs, cross-complainant and Corey Bros. to avail themselves of the voluntary extensions of time in which to exercise their option, defendant was compelled to proceed

with the completion of the project, or lose the $35,000 paid therefor. The almost insurmountable difficulties which confronted it are evident from the fact that defendant spent upward of $846,000 in construction work, litigation arising out of attempts on the part of other water users to cancel the permits, the assumption of settlers' contracts with the burdens and obligations incident thereto, repurchasing of property which had been sold for taxes, the acquisition of additional reservoir site, payment of delinquent taxes, etc. It must also be borne in mind that such expenditures were made by defendant and such work done with the knowledge that forfeitures might be declared by both the government and the state for failure to carry out the terms of contracts made by the Big Lost River Irrigation Company and its predecessors. In the face of these facts, as established by the record, we cannot see how it can be logically contended that Wattis or defendant intended that the deed and agreement should constitute a mortgage and not a deed absolute with option to purchase. Added to this, we have the further fact, which we must assume to be established, under the conflict of evidence rule, that Wattis, acting for defendant, positively refused to accept a mortgage on the property, to loan money or extend credit to these parties, and also refused to enter into an agreement with plaintiffs, cross-complainant and Corey Bros., prepared by plaintiff Henderson, which might have been construed to be a mortgage, Wattis insisting that the agreement of June 17, 1914, be accepted by the parties, otherwise he would not enter into any agreement. In this connection it may be proper to observe, touching the intention of the parties, that the record discloses that all of the parties, with the possible exception of plaintiff, Henderson, understood that the agreement simply gave them an option to purchase, and upon their failure to exercise it their rights under the agreement terminated and ended and defendant retained the property. The acts and conduct of all the parties, as disclosed by the evidence, point to but one conclusion, namely, that the deed was intended as an absolute

conveyance with option to repurchase, which is in accord with the finding of the lower court.

Appellants cite and rely upon the case of *Kelley v. Leachman*, 3 Ida. 392, 29 Pac. 849. We have carefully studied that case, but do not think the same applicable to the facts in the case at bar. It is true, in the course of that opinion, the court uses the following language:

"When at the time of the execution of an absolute conveyance a separate defeasance or agreement to reconvey is also executed, the transaction at law will constitute a mortgage."

The rule above stated is too narrow. (See criticism, note 3, p. 234, L. R. A., N. S., 1916B.) It fails to incorporate other necessary and controlling elements and eliminates the question of intention of the parties and encroaches upon their right to contract. In effect, literally speaking, this portion of the opinion holds that a deed, in form an absolute conveyance, expressing the intention of the parties, coupled with possession, payment of taxes, assertion of ownership and with a positive understanding by the grantee that he had an absolute conveyance and his positive refusal to accept anything but an absolute conveyance, cannot be upheld as such if at the time of the execution of the deed an agreement was entered into to reconvey the property. Such a holding is contrary to the great weight of authority and not in harmony with prior and recent decisions of this court. It may be noted further that 2 Devlin on Deeds, 1100, 1101, is quoted as authority for the rule laid down above, yet we notice in that work, sec. 1100, the following:

"On the issue as to whether a deed was intended as a conveyance or a security, the intention of the parties is the infallible test, such intention to be gathered from all the surrounding circumstances" (citing numerous cases).

The intention of the parties is therefore an essential element, and the rule laid down in the Kelley-Leachman case quoted above is defective in this respect. However, the facts in that case disclose that there was a separate defeasance clause as follows: "and the said second party agrees to pay the said interest and taxes and assessments as the same shall

become due; and in like manner to pay the interest upon the said Corbin Banking Company mortgage, and that he will not .suffer any injury, waste or damage to be committed upon or to said premises; and, in case any interest, taxes or assessments should remain unpaid for thirty days after the same shall become due, he, the said party, will then quit and surrender the whole of said premises to the said party of the first part, his heirs or assigns.''

In the case at bar there is no question of forfeiture and no defeasance clause in the agreement. We have but the simple question of the failure to exercise an option, with possible consequential loss suffered by failure or refusal to take advantage of an existing right within the time stipulated by the parties.

Neither are the facts of the case of *Johansen v. Looney,* 31 Ida. 754, 176 Pac. 778, relied on by appellants, analogous to those of the instant case. In that case it was conceded that the deed given by Johansen to Looney was a mortgage and given as security for a loan, but Looney sought to purchase the equity of redemption and his acts and conduct, whether intentional or otherwise, were found by the court to constitute fraud, the facts disclosing such circumstances as clearly indicated an intention to convert a mortgage into an absolute deed.

It is urged by appellants that Hoag acted without authority in making certain arrangements with defendant, particularly with reference to the agreement on the part of defendant to deliver to Hoag $50,000 and $20,000 worth of settlers'°contracts for the benefit of Hoag and his associates, that this was secretly done for the purpose of defrauding plaintiffs and creditors of Corey Bros., and that thereby defendant recognized the interests of Hoag and his associates. It will be remembered that the arrangement to deliver the water contracts was made subsequent to the time that the option to repurchase and the extension voluntarily granted by defendant expired. So far as the evidence before us is concerned, the defendant's promise to deliver settlers'

contracts was gratuitous and without consideration, given expressly for the purpose of assisting Hoag and his associates and its delivery could not have been enforced. Further, such delivery was expressly made dependent upon defendant's success in the reconstruction of the project and delivery was to be made only in proportion to the amount of land finally brought under irrigation and then only as certain units were completed. It is alleged and conceded that Hoag, at the time of the master's sale and when the agreement was signed, was agent for and represented plaintiffs, cross-complainant and Corey Bros. with full power to act, and each of the principals had actual knowledge of the contents of the agreement, including that relating to the option to purchase. The record also shows that Hoag advised Corey Bros., plaintiffs and cross-complainant that defendant had notified him of its determination not to complete the project. Their knowledge of the various matters is further evidenced by the fact that they met frequently and discussed plans for raising the $35,000 with which to exercise their option and they were following up each and every act of Hoag as their representative, who, it is shown by correspondence and otherwise, kept in constant touch with all the parties and they were bound by his acts.

It is insisted that the payment of $23,864 to W. W. Corey and stockholders of Corey Bros. in settlement of the $40,000 commission agreed to be paid to W. W. Corey for assistance to be rendered by him in connection with the completion of the project was a recognition of plaintiffs' interest in the property. It would seem from the evidence that this payment, like the agreement to deliver settlers' contracts, was a gratuity and an arrangement with which the plaintiffs were in nowise interested, nor parties thereto, and in connection with which there was no fraud shown.

The only conclusion that can be reached, under the record, is that the master's deed of July 30, 1914, and the agreement of June 17, 1914, do not constitute a mortgage but an absolute sale with option to purchase and that the intention of

40 Idaho—44

all the parties was to this effect. Inasmuch as there is substantial evidence in the record to support the findings and judgment of the lower court, the same will not be disturbed. This rule applies to actions in equity as well as at law.

In view of these conclusions we feel that no good purpose would be served in discussing numerous other alleged errors so ably presented in appellants' brief. This action being one in equity and not at law, and having determined that no mortgage existed, we are therefore in no position to determine questions of law.

The judgment should be affirmed, and it is so ordered. Costs are awarded to respondent.

William A. Lee, C. J., Wm. E. Lee and Taylor, JJ., concur.

Givens, J., being disqualified, did not sit at the hearing nor take part in the opinion.

Petition for rehearing denied.