(No. 7112. October 26, 1943.)

FREDERICK BRUCE DICKEY, Executor of the Last Will and Testament of Bruce Dickey, deceased, Appellant, v. ROBERT E. CLARKE and BRUCE ROBERT DICKEY, Respondents.

[142 Pac. (2d) 597.]

248

Geo. Donart for appellant.

Walter Griffiths and Richards & Haga for respondents.

HOLDEN, C.J.—June 14, 1940, at San Marino, California, Bruce Dickey, now deceased, then and at the time of his death a resident of the State of Idaho, executed his last will and testament. By his will, the deceased devised and bequeathed all his property to his son, Frederick Bruce Dickey, in trust, stating that:

"It is the express provision of this trust that should BRUCE ROBERT DICKEY (minor grandson of the testator) not have attained his majority at the time of my death and should one-half ($\frac{1}{2}$) of the net income from this trust in the discretion of my Trustee, be not sufficient to provide said BRUCE ROBERT DICKEY with a reasonable education, and if BRUCE ROBERT DICKEY is not financially able to pay for said education, then my Trustee shall hold such portion of all net income as in his discretion is necessary, and if that be not sufficient, said Trustee may pay to, apply or expend, so much of the principal as said Trustee may deem necessary and advisable for the purpose. Providing the one-half of the net income shall be sufficient to provide the education as above, then the remaining one-half or any portion thereof unused for the above purpose, shall be distributed to FREDERICK BRUCE DICKEY, or to his issue."

The will further provided that:

"When BRUCE ROBERT DICKEY, has attained majority, I direct my Trustee to distribute the trust estate as follows:

"One-half ($\frac{1}{2}$) thereof to FREDERICK BRUCE DICKEY, or to his issue;

"One-fourth ($\frac{1}{4}$) thereof to BRUCE ROBERT DICKEY, or to his issue;

"The remaining one-fourth (¼) shall be retained and administered by the Trustee until BRUCE ROBERT DICKEY shall have attained the age of twenty-five (25) years, at which time my Trustee shall deliver the entire principal and accumulated income, to BRUCE ROBERT DICKEY, or his issue.

"Should BRUCE ROBERT DICKEY die during the administration of this estate or during the time of operation of this trust, without issue, then this trust shall terminate and my trustee is directed to pay all expenses for a proper funeral and burial and the entire estate shall go and be transferred and delivered in fee to FREDERICK BRUCE DICKEY, or to his issue."

March 2, 1942, Bruce Dickey, deceased, signed a lease to the 120 acre farm, owned by him, located in Canyon County, Idaho (the farm involved in this controversy), on a share-the-crops basis, to Robert E. Clarke, for a term of three years. On that date Bruce Dickey acknowledged the execution of the lease by him before M. C. Baldridge, notary public. March 10, 1942, Bruce Dickey (then and for some time prior thereto a widower) executed to Robert E. Clarke (a former son-in-law, the wife, a daughter of Bruce Dickey, being deceased) and to Bruce R. Clarke (seventeen year old minor grandson, as well as adopted child), a deed to the said 120 acres of farm land, for a recited consideration of $1.00. March 12, 1942, the execution of the deed was acknowledged before M. C. Baldridge, notary public.

March 14, 1942, Bruce Dickey and Robert E. Clarke (R. E. Clarke and Robert E. Clarke being one and the same person), leased to one E. A. Wyatt, for a term of a year, a five room house, barn and chicken house standing on the land described in the above mentioned deed, at a rental of $20.00 per month. March 16, 1942, the execution of this lease was acknowledged before M. C. Baldridge, notary public, by Bruce Dickey, R. E. Clarke and E. A. Wyatt, being all of the parties to the lease.

March 18, 1942, Bruce Dickey died on the farm in litigation here.

April 3, 1942, the said will was admitted to probate in the Probate Court of Canyon County, Idaho, as the last will and testament of the said Bruce Dickey, deceased, and thereupon the said Frederick Bruce Dickey, named by the deceased and appointed by the court, executor, duly quali-

fied as the executor of said last will and testament, and entered upon the discharge of his duties.

May 19, 1942, Frederick Bruce Dickey, executor of the last will and testament of Bruce Dickey, deceased, filed a complaint against defendants and respondents Robert E. Clarke and Bruce Robert Dickey (Bruce R. Clarke and Bruce Robert Dickey being one and the same person), a minor, in the District Court in and for Canyon County, to quiet title to the property described in the deed executed by Bruce Dickey to Robert E. Clarke and Bruce Robert Clarke, as above stated.

June 6, 1942, defendants and respondents answered the executor's complaint and also filed a cross-complaint. By their cross-complaint defendants and respondents sought to quiet title in themselves to the tract of land described in the said deed executed by Bruce Dickey March 10, 1942.

July 28, 1942, plaintiff and appellant, Frederick Bruce Dickey, filed an answer to said cross-complaint. His answer to the cross-complaint, among other things, alleged that: "the said Bruce Dickey was in ailing and failing health and continued to be in ill and ailing and failing health, and to grow gradually weaker mentally and physically until the date of his death, as aforesaid; that by reason of the depletion and growing and increasing disability of his mind and body, the said Bruce Dickey from shortly before the said Robert E. Clarke took up his residence with the said Bruce Dickey as aforesaid, was subjected to the will and desires of the said Robert E. Clarke, and relied upon the advice and direction of the said Robert E. Clarke in and about his business affairs; * * * that if said deed was executed or delivered by the said Bruce Dickey, as alleged and set out in the cross complaint on file herein, it was so executed and delivered without consideration or desire or understanding on the part of the said Bruce Dickey, and at the direction, suggestion, and undue and fraudulent influence of the said Robert E. Clarke, and without any understanding or comprehension thereof or as to the contents thereof, by the said Bruce Dickey."

November 13, 1942, the main suit and cross suit were tried before the court sitting without a jury. December 30, 1942, findings of fact and conclusions of law were made and filed and a decree entered thereon in favor of defendants and respondents and against plaintiff and appellant. The appeal to this court is from the decree.

Appellant concedes the deceased executed and acknowledged and then delivered to respondent, Robert E. Clarke, a deed to the 120 acre tract in controversy, but, and as alleged in his answer to respondents' cross-complaint, contends the deceased was physically and mentally weak; that a confidential relation existed between Clarke and deceased; that he did not understand the nature and extent of his act and deed; that the deceased was subject to the will and desire of respondent, Robert E. Clarke, that the deceased was induced to execute and deliver the deed by the exercise of undue influence on the part of respondent, Robert E. Clarke; that the deceased executed and delivered the deed at the request and direction of respondent, Robert E. Clarke and, therefore, that the execution and delivery of the deed was not the free and voluntary act of the deceased.

Touching these contentions the record discloses that respondent Robert E. Clarke drove the deceased to the Maxey service station at Caldwell where Maxey, at the request of the deceased, called attorney Griffiths by phone to arrange an appointment with that attorney; that pursuant to the appointment so made the deceased went to the office of this attorney; that at the request of the deceased Mr. Griffiths prepared the deed in question here and mailed it to the deceased; that said respondent drove the deceased to the office of the notary at the time the deceased acknowledged the execution of the deed; that said respondent drove the deceased to town at different times to negotiate for and purchase machinery; that the deceased was a very sick man and that he had all the symptoms that go with heart disease —shortness of breath and labored breathing; that the deceased had fainting spells; that he was forgetful; that he would ask a question and a few minutes later ask the same question over again; that the deceased would pay a milk bill and then go back in a few days and ask if he had paid it; that he would go to town to get things and then forget what he went for; that a Mr. Cranston went to the deceased to buy the farm in controversy and that the deceased stated he wanted $150.00 an acre and that "about that time Mr. Clarke came into the conversation and he said he and Mr. Dickey had made arrangements to farm it; that they were going to keep the farm and operate it; he had changed his mind about selling it;" that a couple of days after the execution and delivery of the deed the deceased and respondent, Robert E. Clarke, joined in the

execution of a lease to a part of the property in question to one E. A. Wyatt; that respondent Robert E. Clarke was with deceased every day; that "Q. And were very attentive to him? A. We tried to be, yes. Q. Cooked for him? A. Yes"; that said respondent and deceased had a joint bank account; that "Q. As a matter of fact he (deceased) put the money in the bank and you (said respondent) would draw on his bank account? A. Yes. Q. It was his money? A. He deposited it, yes. Q. He went to the bank and made arrangements for you to draw on it? A. Yes, sir. Q. That was in the spring of 1942? A. Yes."

That Doctor William Mitchell (called by appellant) saw the deceased February 26 and March 14, 1942; that "Q. Did he have sufficient intelligence, so far as you could observe, to know what an instrument was, or that he owned a ranch? A. Oh, I think so. Q. Did he have sufficient intelligence to know that he might desire to give it to someone. A. Probably. * * * Q. Doctor, would you say that during this illness that his (referring to the deceased) condition would be such that he would be susceptible to the influence of someone who would make a suggestion to him? A. I would have to qualify that answer and say that his sickness would dull his keeness of mind."

It appears from the record appellant Frederick Bruce Dickey testified that many times he and deceased talked over the relations between respondent Robert E. Clarke and the deceased; that the substance of these conversations was that "he (deceased) wasn't particularly friendly minded towards Clarke because of his (Clarke's) attitude towards my sister, and also to the boy, (referring to the grandson of deceased, Bruce Robert Dickey) he having permitted him to come to Idaho, and he made no effort to contact either my sister or Bruce in person or by correspondence, and until my sister died in 1932 Clarke did not come to Idaho to see them, and after that my father on several occasions indicated to me that all the property was to remain in trust for the benefit of Bruce so long as he needed it for his education, and then it was to be distributed according to the trust"; that his (appellant's) father adopted his grandson, Bruce Robert Dickey, with the consent of the grandson's father, respondent Robert E. Clarke; that "Q. Did your father have any other reasons as to why he preferred to have Bruce Robert under any other influence other than the influence of Mr. Clarke?

A. Yes, he remarked a number of times that he didn't like the set-up of Clarke's very well, that there was always a little too much booze around."

That respondent Robert Bruce Dickey (grandson of the deceased) testified his grandfather (deceased) talked to him about getting his father (respondent, Robert E. Clarke) and deeding this property (referring to the property in question) over for a home for him; that his grandfather talked to him quite a bit about it; that his grandfather "had always said, he had always told me that he wanted Dad to come up and farm the place. That was the original plan. He told me that is what he had in mind all the time, and things didn't work out quite right at first and it finally got so that he thought, he said he thought things would be all right, so he had him come up and wanted him to make a home for me up here. He said he thought that would be the best way to do it"; that his grandfather told him that he was going to deed the ranch to him and his father (respondent, Robert E. Clarke); that in the conversations the witness had with his grandfather his father was not criticized in any way; that his grandfather told him he was going to send for his father, "and then one night he told me to write him a letter to tell him to come up, he wanted him to come up, oh, I should judge about the middle of December (1941)"; that "Q. Now in these years, and in the recent months, what did you notice about your grandfather's mental condition? A. Well, he always seemed to be just as bright and mentally alert as he ever had been as long as I have known him"; that "Q. Bruce, did you notice your grandfather's memory failing in any way? A. Oh, not any more than any man. Q. You did notice his memory was failing? A. Oh, he would go to town to get something and then forget it; that is all I ever noticed. Q. Did you see him when he would try to pay a bill twice? A. Yes. Q. Pay the milk bill and forget it and then go back the next day and try to pay it again. A. Yes."

The record also discloses that Mr. Griffiths, the attorney who prepared the deed for the deceased, testified that: "Mr. Dickey told me that he wanted to have these deeds made. Q. Did he (referring to deceased) have a mind of intelligence sufficient to conceive the plan as to how he wanted his property disposed of? A. Very decidedly. Q. Would you say he would know the effect of a deed if he made one? A. Yes, indeed."

The record further shows that one E. A. Wyatt wanted to lease a house and other improvements standing on the 120 acre tract in question; that on the evening of February 23, 1942, he went over to Dickey's place; that he leased these improvements and, later, February 27, moved in; that he had already made application for a government loan to raise chickens; that just a few days before he moved in he got a notice from the government demanding a written lease; that he then went to the deceased (the evening of March 14, 1942) and told him he had to have a written lease; that the deceased then said, "Bob (speaking to respondent, Robert E. Clarke), come here," and "he told him what I wanted and asked him if he thought it would be all right; that it was all right with him. He said, after Bob went out in the kitchen, he said, 'Bob will have to sign the lease' "; that in discussing a lease prepared by one Don Lacklin, read aloud by respondent, Robert E. Clarke, the deceased said he didn't like a statement in the lease "in regard to the pasture"; that the deceased said he thought the description of the pasture in the lease was too broad; that thereupon the deceased told respondent, Robert E. Clarke, to take a pen and write into the lease the following description: "consisting of ditch bank and waste land in draw on east end of the south half of the northeast quarter, Section 33, Township 5 North, Range 5 West of Boise Meridian" (which circumstance, respondents argue, shows the deceased was mentally keen and alert) ; that deceased told Wyatt respondent, Robert E. Clarke and his wife had worked on the place in California and had "built it up quite a bit," and that the deceased said he had told said respondent he would "make it right with him sometime; that he had always intended to but never had"; that the deceased told him he was not feeling well and possibly would not live long, so had decided if he was ever going to do anything for Bob he had better be doing it, "so I (deceased) deeded the place to him and Bruce"; that the deceased said "the deed is not recorded yet and in fixing up this contract, Mr. Clarke, he is the owner and will have to sign the lease." "He said, 'all your dealings,' he said, 'will have to be with Mr. Clarke in the future because he is the owner of the place,' but he said, 'the deed not being recorded I will sign your lease too, because they might look up the record right away and find it was not in Clarke's name.' "

And, finally, there is considerable evidence in the record

in substance that the deceased was strong-willed, aggressive, vigorous; that he was a determined sort of person; that the deceased knew very definitely what he wanted to do; that the deceased was mentally alert and that the deceased was an intelligent, capable man.

On that evidence the trial court found:

"That the execution and delivery of the said warranty deed by the said grantor, Bruce Dickey, to the said Grantees therein named, and defendants and cross-complainants herein, was the free and voluntary act of the said grantor. That at the time of the execution and delivery of the said deed, the said grantor knew and comprehended what he was doing, and the nature, extent and effect of his said act and deed. That said warranty deed was not executed or delivered upon the request, suggestion or direction of said defendants and cross-complainants, or either of them. That the said defendants and cross-complainants did not, nor did either of them, impose upon, or exert over, the grantor in said warranty deed, any undue, fraudulent or unlawful influence, or duress, in the execution, or in any of the actuating forces exercised in the execution of the said warranty deed, and that at the time of the execution and delivery of the said warranty deed, the said grantor therein named was fully competent and in every way capable of executing the said instrument."

This court is firmly committed to the rule that findings supported by substantial evidence is controlling on appeal, and that where there is sufficient evidence, if uncontradicted, to support the findings the findings will not be disturbed. (*Condie v. Swainston,* 62 Ida. 472, 479, 112 P. (2d) 787; *Bussell v. Barry,* 61 Ida. 350, 353, 102 P. (2d) 280; *Aslett v. Evans,* 48 Ida. 206, 209, 280 P. 1036; *Fairbairn v. Keith,* 47 Ida. 507, 511, 276 P. 966; *Heylman v. Idaho Continental Min. Co.,* 43 Ida. 129, 141, 250 P. 1081; *Clegg v. Eustace,* 40 Ida. 651, 655, 237 P. 438; *Clinton v. Utah Construction Co.,* 40 Ida. 659, 690, 237 P. 427.)

And this court held in Estate of Randall, 58 Ida. 143, 146, 70 P. (2d) 389, that where the facts "might very well lead different minds to reaching different conclusions upon the issue presented; and where such is the case, however meager the evidence, if it is of a substantial nature and character, the findings of the triers of fact should prevail." (*McKissick v. Oregon Short Line Ry. Co.,* 13 Ida. 195, 89

P. 629; *Fleenor v. Oregon Short Line R. Co.*, 16 Ida. 781, 803, 102 P. 897; *Denton v. City of Twin Falls*, 54 Ida. 35, 43, 28 P. (2d) 202; *Call v. City of Burley*, 57 Ida. 58, 62 P. (2d) 101, 105.)

 But appellant insists he proved the existence of a close confidential relationship between the deceased and respondent Robert E. Clarke and that where such a relationship is proven to exist between a grantor and a grantee of a gift deed the burden of proof shifts to "the grantee to prove to the satisfaction of the court that the deed was procured without suggestion of undue influence on his part," citing and principally relying upon *Cox v. Schnerr*, (Cal.) 156 P. 509; *Wilbur v. Wilbur*, (Cal.) 239 P. 332; *Addis v. Grange*, 358 Ill. 127; 26 C.J.S., sec. 193, p. 167. Assuming these cases hold, as contended by appellant, that a confidential relationship being established, the burden is then cast upon the grantee to show an absence of undue influence by proving that the transaction was in good faith on his part and was equitable and just between the parties, in this jurisdiction, however, the existence of a confidential relationship between a grantor and grantee is not alone sufficient. In *Turner v. Gumbert*, 19 Ida. 339, 114 P. 33 (a suit to set aside a deed from an aged mother to her daughter) this court held:

"The confidential relations naturally existing between a mother and daughter do not of themselves raise any presumption of undue influence on the part of the daughter, nor does the love and affection ordinarily manifested between parent and child create such presumption."

And quoted with approval the following holding of the Supreme Court of California in *Goodwin v. Goodwin*, 59 Cal. 561:

"Undue influence, to vitiate an act, must amount to force and coercion, destroying free agency; it must not be the influence of affection and attachment; it must not be the mere desire of gratifying the wish of another, for that would be very strong ground in support of a testamentary (or other) act; further, there must be proved that the act was obtained by this coercion, by importunity which could not be resisted; that it was done merely for the sake of peace; so that the motive was tantamount to force, or fear."

It thus appears this court in *Turner v. Gumbert*, supra, in effect, held that a confidential relationship standing alone

is not sufficient to establish the undue influence which the law denounces, in that if this court had taken that view it would necessarily have held the deed involved in that suit was subject to cancellation. Moreover, if a confidential relationship (between grantor and grantee), standing alone, was sufficient evidence of undue influence it would be difficult to conceive of any circumstances under which a parent could give property to a son or daughter, because no competent parent would likely give property of any considerable value to a son or daughter whom he or she did not love nor trust. To hold that a confidential relationship, standing alone, was sufficient to invalidate a gift deed would, to say the least, constitute a dangerous precedent.

Furthermore, an examination of *Turner v. Gumbert,* supra, discloses that appellant John Turner, as will presently appear, made substantially the same contention as appellant makes in the case at bar. Turner contended (see p. 341) that:

"Where the circumstances are such as to raise the presumption of fraud or undue influence, as where one of the parties is enfeebled by sickness or old age and the relation of the parties is one of special trust and confidence, the burden is upon the donee to show by clear, convincing and satisfactory evidence that the gift was the voluntary and intelligent act of the donor."

Here, appellant Dickey insists the record discloses that a close confidential relationship existed between the deceased and respondent Robert E. Clarke; that the record also discloses circumstances which indicate respondent Robert E. Clarke exercised undue influence over deceased and thus procured the execution and delivery of the deed in controversy; that at the time of the execution and delivery of the deed the deceased was very sick, aged and infirm; therefore, the burden was upon "the grantee to prove to the satisfaction of the court that the deed was procured without suggestion of undue influence on his part."

And in both *Turner v. Gumbert,* supra, and the case at bar, the grantors and grantees were together every day and the gift deeds were not recorded until after the death of the grantors.

■ First, we point out that respondents in the instant case proved (as appellant contends they must) to the satisfaction of the trial court, "that the deed was procured without suggestion of undue influence on his (respondent

Robert E. Clarke's) part," in that the trial court found "that said warranty deed was not executed or delivered upon the request, suggestion or direction of said defendants and cross-complainants (respondents), or either of them" and that the execution and delivery of the deed "was the free and voluntary act of the said grantor." Next, with substantially the same question presented to it, and upon very similar facts and circumstances, this court held in *Turner v. Gumbert,* supra, as above pointed out, that a confidential relationship between a grantor and grantee, was not sufficient, standing alone, to justify the cancellation of a gift deed.

Appellant further contends that having alleged and proved a confidential relationship existed between the deceased and respondent Robert E. Clarke, the failure of the trial court to so find constituted reversible error. While the trial court did not expressly find on that issue, it did expressly find that the execution and delivery of the deed involved in this suit was the free and voluntary act of the deceased; that the deceased knew and comprehended the nature, extent and effect of his act in executing the deed; that the deed was not executed at the request, suggestion or direction of respondents; that the respondents did not exert over the deceased "any undue, fradulent or unlawful influence, or duress in the execution, or in any of the actuating forces exercised in the execution of the said warranty deed"; that the deceased "was fully competent and in every way capable of executing the said instrument."

If the deceased knew and understood the nature and effect of his deed; if he "was fully competent and in every way capable of executing the said instrument"; if the deed was not executed at the suggestion or request of respondents; if the respondents did not exert over the deceased "any undue, fraudulent or unlawful influence," and if the execution and delivery of the deed "was the free and voluntary act" of the deceased, as the trial court expressly found, a confidential relationship between the grantor and grantee, standing alone, would not, under the rule announced in *Turner v. Gumbert,* supra, be sufficient to invalidate the deed. Hence, under the facts so found, it was immaterial as to whether a confidential relationship existed.

This court held in *Kelly v. Perrault,* 5 Ida. 221, 48 P. 45, that:

"A grantor who has mental capacity sufficient to under-

stand ordinary business transactions at the time of the *factum,* and understands the motive and effect of the deed which he makes, knows what property he is conveying and to whom it is being conveyed, is competent to make such deed."

Cited and followed in *Curtis v. Kirkpatrick,* 9 Ida. 629, 640, 75 P. 760.

Furthermore, it is the "general rule in this jurisdiction that findings of fact are to be liberally construed in support of the judgment," and that "findings will receive the most liberal construction the language used will permit in order to sustain a judgment founded thereon." (*Eastwood v. Standard Mines etc. Co.,* 11 Ida. 195, 203, 8 P. 382; *Wilkinson v. Bethel,* 13 Ida. 746, 749, 93 P. 27; *N. Bennett Co. v. Twin Falls L. etc. Co.,* 14 Ida. 5, 27, 93 P. 789; *Fouch v. Bates,* 18 Ida. 374, 386, 110 P. 265; *Donaldson v. Donaldson,* 31 Ida. 180, 184, 170 P. 94; *Fehr v. Haworth,* 33 Ida. 96, 98, 190 P. 248; *Marysville Development Co. v. Hargis,* 41 Ida. 257, 262, 239 P. 522; *Fairbairn v. Keith,* 47 Ida. 507, 510, 276 P. 966; *Gem State Lbr. Co. v. Galion Irr. Land Co.,* 55 Ida. 314, 325, 41 P. (2d) 620.)

It follows the decree must be affirmed, with costs to respondents, and it is so ordered.

Ailshie and Givens, JJ., and Winstead, D.J., concur.

Budge, J., did not sit at the hearing or participate in the decision.

Dunlap, J., considered himself disqualified and did not sit at the hearing or participate in the decision.