714 P.2d 13 (1986)
110 Idaho 44
In the Matter of X Child Under the Age of 18 Years.
The IDAHO DEPARTMENT OF HEALTH AND WELFARE, State of Idaho, Appellant,
v.
Tim SYME and Donna Syme, natural parents, Respondents, and
James C. Dale, Guardian Ad Litem, Respondent.
No. 15662.
Supreme Court of Idaho.
January 17, 1986.
Rehearings Denied February 28, 1986.
*14 Jim Jones, Atty. Gen., Mark A. Ingram, Deputy Atty. Gen., Dept. of Health and Welfare, Boise, for appellant.
Joel E. Tingey, Boise, for respondent Tim Syme.
David E. Kerrick, Caldwell, for respondent Donna Syme.
James C. Dale, Nampa, Guardian Ad Litem, pro se.
SHEPARD, Justice.
This is an appeal from an order of the district court which affirmed the magistrate court's dismissal of a petition filed by Health and Welfare under the Child Protective Act, Title 16, Chapter 16, Idaho Code. The petition sought temporary custody of a four-year-old child of the Symes, or in the alternative, protective supervision of the child in her own home. We reverse in part with instructions for further proceedings.
The Symes had been married approximately ten years and had three children, including four-year-old (X) who is the subject of the instant action. Donna Syme became suspicious that there was sexual activity between her husband and her four-year-old daughter. She left her husband and filed for divorce, which was granted on October 12, 1983. The divorce decree does not address the alleged sexual activity. In the divorce decree the Symes were awarded joint legal custody of their three children, including (X), with Mrs. Syme awarded physical custody subject to Mr. Syme's right of visitation every other weekend, every other holiday, and four weeks during the summer.
During the pendency of the divorce, Mrs. Syme took (X) to a family physician whose examination was negative as to any sexual molestation of (X). Mrs. Syme also took (X) to a psychologist and to a counselor, both of whom reported they could not detect any evidence of sexual molestation. Mrs. Syme then arranged with a State mental health unit to have (X) seen by a psychologist, but (X's) lack of verbal skills prevented him from reaching a conclusion as to the accusation of molestation. In September 1983, Mrs. Syme, through the Department of Health and Welfare, arranged for (X) to be placed in an incest group program, and (X) was thereafter involved in individual counseling and group counseling.
In October 1983, (X) was interviewed by Dr. McQueen, a psychologist, wherein (X) indicated that she had been involved in sexual activity with her father, her mother, and one of her brothers. That indication was made by (X) through the use of what are known as anatomically correct dolls, and by nodding her head "yes" or "no" in response to questions. Dr. McQueen conducted another videotaped interview of (X) on October 17, 1983. The tape was admitted into evidence at the hearing and shows (X) using the anatomically correct dolls. (X) indicated in the videotape that there were sexual "secrets" between she, her mother, her father, and her brother. On November 23, 1983, Dr. McQueen and a social worker conducted still another interview with (X) which was also videotaped. The results of that interview were similar to the previous ones except that (X) also implicated her second brother.
Mrs. Syme was out of town when this last interview took place, and (X) was about to spend the Thanksgiving weekend with her father. A Caldwell police detective declared (X) to be in imminent danger and she was temporarily placed in a foster home. On November 28, the present petition was filed under the Child Protective Act. After a shelter care hearing was held that same day the temporary custody of (X) was placed in the mother, and the father was prohibited from having any contact with the child until after an adjudicatory hearing. No criminal charges were, or ever have been, filed against the father.
At the request of Health and Welfare a Dr. Schaffer conducted a physical exam of (X) on November 29, 1983, which was negative and inconclusive as to any sexual abuse or molestation. The father submitted to a polygraph examination on December 14, 1983, which resulted in an indication *15 that the father was telling the truth when he denied sexual activity between him and her. A copy of that polygraph report was provided to other counsel, but no stipulation was reached as to the admission of that polygraph examination at trial.
An adjudicatory hearing was held on the petition before a magistrate. The State made a motion in limine to exclude any evidence of the polygraph exam, but that motion was denied. At the hearing Dr. McQueen testified that in his opinion (X) had been sexually abused by family members, and a social worker testified as to her observations of (X) in the incest group program.
Testifying on behalf of the respondent father was one John Dawson, a counselor who had interviewed (X). He contradicted the opinion of, and the techniques used by, McQueen. The father of the child also testified and denied any sexual involvement with (X). The polygraph examiner was permitted to testify that his exam indicated that Syme's denial of involvement in sexual activity with (X) was truthful.
The magistrate concluded that the State failed to demonstrate the allegations in the petition by a preponderance of the evidence, that (X) did not come within the purview of the Child Protective Act, and he dismissed the case noting:
"There is no firm evidence before the court. Only the testimony of parties who have interviewed the child, and their own interpretation of the possibility of endangerment.
"The statute requires proof by a preponderance of evidence. There simply is no proof, opinions yes, speculations yes, but firm proof, no."
That decision of the magistrate was appealed by Health and Welfare to the district court which affirmed the decision of the magistrate. Thereafter the prosecuting attorney of Canyon County purported to file an appeal to this Court from the order of the district court, affirming the magistrate's decision. An amended notice of appeal was filed by the Attorney General's office. Respondent moved to dismiss the appeal as being untimely filed since the action of the Office of the Attorney General was not taken within the required time limitation for filing an appeal. The Court has previously considered that motion to dismiss and it has been denied.
The appellant Health and Welfare contends that the district court erred in affirming the magistrate's decision since the magistrate's findings of fact were clearly erroneous. I.R.C.P. 52(a) requires a trial court to make findings of fact and separate conclusions of law in actions tried without a jury. Here the magistrate specifically found as follows:
"In a report to the court from the Department of Health and Welfare, filed December 2, 1983, the allegation is made that at that interview the child indicated a sexual contact with her father and brother. The child is not quite 5 years of age. From the testimony it appears there was no verbalization from the child. Apparently statements were made to her and she either nodded "yes" or "no".
"It also appears she, [X], was placed in the SANE program. The report alleges here she verbalized the incidents, but such testimony was not presented to the court, only that the child finally interacted.
"Dr. McQueen's interview, the interviews with the other staff members, the SANE program and peer associations at these meetings and the numerous interrogations this child has been subjected to, at the very least, gives this Court concern of an extreme contamination of any information she (the child) might supply because of the statements and suggestions she has experienced in all these examinations. Not only does there exist the very real possibility of contamination of any information the youngster might give, but there was another witness, Dr. John Dawson, with credentials equal to that of the State's witnesses, who contradicted the methods used by Dr. McQueen and his findings were dramatically opposed to Dr. McQueen's as to *16 whether any activities had occurred after he interviewed [X].
"There is no firm evidence before the court. Only the testimony of parties who have interviewed the child and their own interpretation of the possibility of an endangerment.
"The statute requires proof by a preponderance of evidence. There simply is no proof, opinions, yes, speculations, yes, but firm proof, no."
Appellant Health and Welfare asserts that the findings of the magistrate overemphasize a lack of verbalization by the child, and further assert that such verbalization is unnecessary in cases of a very young child alleged to have been sexually abused. As noted in our recent decision of State v. Snapp, 110 Idaho 269, 715 P.2d 939 (1986), wherein we discussed, albeit in a criminal context, admission of testimony relating to child sexual abuse syndrome, very young children may not possess verbalization skills and a child who has been the victim of sexual molestation may for a variety of reasons be unable to discuss the specific instances. For these reasons, sexual abuse has been called the "perfect crime." Bowes, Libai's Child Courtroom: Is it Constitutional?, 7 J.Juv.L. 31, 39 (1983).
It was indicated by a witness for Health and Welfare at the hearing that in her opinion there is an important distinction between "non-verbal" and "non-responsive" and that in the interviews with (X) she was never non-responsive but rather was alert, interested, and communicative.
We need not, however, base our decision in this case on the distinction, if any, between non-verbal and non-responsive since the record reflects both through the testimony of Dr. McQueen and through the videotape of the November 23, 1983 interview that (X), to some extent, did engage in verbalization. For example, Dr. McQueen testified that (X) was able to verbalize as to the family names used to describe sexual parts, and in the videotaped interview (X) was able to verbalize as to the "secrets" between her and her father and her brother, where they took place, and when they took place.
The videotape was admitted in evidence at the hearing, but the findings of the magistrate make no reference thereto. The magistrate may well have ignored the videotape because, as he found, the court was concerned, "of an extreme contamination of any information she (the child) might supply because of the statements and suggestions she has experienced in all these examinations." The court also in its findings indicated:
"Not only does there exist the very real possibility of contamination of any information the youngster might give, but there was another witness, Dr. John Dawson, with credentials equal to that of the State's witnesses, who contradicted the methods used by Dr. McQueen and his findings were dramatically opposed to Dr. McQueen's as to whether any activities had occurred after he interviewed (X)."
We might therefore infer that the magistrate rejected the methods and the opinions of Dr. McQueen and rather adopted the opinions and findings of Dr. Dawson, and that in any event the magistrate believed that by the time the videotaped interview was conducted by Dr. McQueen that the child's mind had been contaminated. However, in this particular case we believe it more desirable that the magistrate himself make clear why the verbalization described by Dr. McQueen and also shown in the videotaped interview by Dr. McQueen was not considered in the findings. Hence, we remand this case for a consideration of the verbalization evidence of Dr. McQueen and the verbalization evidence depicted in the videotaped interview. We do not require the magistrate to take any additional evidence, however he is not prohibited from doing so. If further evidence is to be taken before the magistrate this would call attention to the fact that the Idaho Rules of Evidence will apply and that I.R.E. 101 modifies I.J.R. 10 by making the rules of evidence applicable in all Child Protective Act proceedings except *17 temporary shelter care hearings. Hence, I.C. § 16-1608(b), "[t]he hearing shall be conducted in an informal manner," is no longer governing in these matters. See comments to Rule 101.
Appellant Health and Welfare also asserts that the magistrate erred in admitting the testimony of the polygraph examiner who performed the polygraph test on Mr. Syme, the father of (X). At the in limine hearing the objection to that testimony was stated, "... we really don't question [the examiner's] ability to perform [a] polygraph, however we don't feel that there is any authority to have that polygraph admitted into evidence in this case." That objection was denied by the magistrate who stated:
"... In reviewing the Child Protective Act and the Y.R.A., our legislature gave the Court a great deal of leeway because they realize that the Court would have to hear areas involving, particularly in Child Protective Act cases, where it is based on the testimony of interviews of very young children, that sort of thing. My feeling is that both in the Y.R.A. and the C.P.A. that the legislature, and the legislative intent, was that these be informal hearings, they've even gone so far to say that, informal in nature where the Court may recess from time to time and I think that a single Judge hearing these matters, without a jury, must evaluate all of the evidence or all of the information, whether we call it evidence or information, that is brought before, because it is a broad area. Now, obviously, I think, the Court hears the evaluation of a psychologist, psychiatrist, possibly, at best, I think to [say] that these are absolutely scientific would be facetious because I don't think that the gentlement who present these statements that they can absolutely guarantee that their analysis is totally true. I think, what the Court has to look at is every bit of information that can be brought before it and then you'll ... the parties will just have to have some faith that the Court will give such weight to each individual area in making a final decision. I'm not going to deny it, I think anything that this Court, under these circumstances, can be provided to make as intelligent a final decision as it possibly can. I'll deny the State's motion and I'll consider that statement as well as any other witness's statement and try to grant them such weight as I can in making an ultimate decision. At best it is a very difficult area for a Court at any time because as in so many of these cases we deal with minor children who cannot come forth before this Court and testify under oath and give exact information. I must take that information and the evaluation of the statements that they've made through a second party and their evaluation of what the child told them. So ultimately what this Court feels any source that is available to it is that much more helpful in making a final decision. So I'll at this time overrule Mr. Breitsameter's motion to quash or prohibit the testimony of this party in this matter."
Respondents assert that Health and Welfare was not misled or suprised by the polygraph evidence, that the trial court did not materially rely on the evidence, and hence the admission of the polygraph testing does not constitute reversible error. Guillard v. Department of Employment, 100 Idaho 647, 603 P.2d 981 (1979); Erhardt v. Leonard, 104 Idaho 197, 657 P.2d 494 (Ct.App. 1983). Counsel for Health and Welfare was provided a copy of the polygraph report approximately a month prior to the hearing, and hence we agree that Health and Welfare was not misled or suprised by the polygraph evidence.
It is not clear from the record, however, whether the magistrate relied upon the polygraph evidence. There is no mention in the findings of the polygraph evidence or that Syme submitted to a polygraph examination. Likewise, in the findings there is no focus on Syme's denial of sexual abuse or that the polygraph testimony buttressed his said denial. Rather, the magistrate in his findings, focused upon the possible contamination of the child's mind from the numerous examinations and interviews.
*18 Health and Welfare asserts that the findings of the magistrate substantially focus on the testimony of the defense witness, John Dawson, a psychological counselor, and in turn Dawson's opinions were based on the results of the polygraph. While Dawson indeed testified that he considered the polygraph examination in forming his opinion, we find that Dawson relied on a number of other factors in his analysis, and the findings indicate that the magistrate focused his ruling more substantially on Dawson's testimony as to these other factors. For example, Dawson testified that he could not substantiate that sexual abuse had occurred, and he questioned the validity of the diagnostic methods used by Dr. McQueen. He also indicated that the child appeared to have been questioned very frequently by a large number of people, and she was very capable of picking up cues and giving what she perceived to be the desired answers. Dawson further questioned the validity of the use of the anatomically correct dolls and noted that the reports of sexual abuse did not originate from the child, but upon the suspicions of the mother just prior to her seeking a divorce.
We hold that there is no showing of material reliance by the magistrate upon the polygraph evidence. Nevertheless, since this case must be remanded to resolve the videotape issue, we further hold that in this particular case the polygraph evidence need not be excluded. We agree with the concerns expressed by the magistrate in denying a motion to exclude the polygraph evidence and hold that those articulated concerns of the magistrate are legitimate.
In many cases of child sexual abuse there are no observers to the act other than the abuser and the victim, and the child is often very young and likewise often unable to adequately articulate the events. Equally troubling is an instance, as here, where it is suspected that the alleged victim is giving contaminated responses because of the number of interview and counseling sessions. No data has been submitted, and we find none, as to the use of anatomically correct dolls, as substantiating sexual abuse. In many cases, as here, physical examinations of the alleged victim are inconclusive. Too often cases rest solely on the testimony and reports of psychologists and counselors interpreting the child's behavior and responses.
It is the respondent's position that Health and Welfare is being hypocritical in arguing against the use of polygraph results in view of the esoteric tests conducted by Dr. McQueen which are no more well founded or scientifically based than is polygraph testing. While we do not necessarily agree with respondent's position that Health and Welfare is being hypocritical, nevertheless we hold that fundamental fairness militates toward admitting the polygraph testimony in Child Protective Act cases in which there are accusations of sexual abuse, and the case against the defendant consists almost entirely of "evidence" received second hand from counselors and psychologists who have interviewed the alleged victim and who have then formed conclusions of sexual abuse based on actions or mental attitudes of the alleged victim. It is a type of evidence which would probably be admissible in no other type of case, and albeit the instant case is not cast in a criminal context, the ability to confront one's accusers is highly curtailed, if not made impossible. See State v. Snapp, 110 Idaho 269, 715 P.2d 939 (1986).
We note further that hearings under the Child Protective Act are conducted by the court without a jury, and thus avoided is the common problem of an exaggerated popular opinion of the accuracy of such a technique with the potential to mislead a jury.
This Court has not previously addressed the question of admissibility of polygraph evidence in civil or criminal trials. Idaho, along with Rhode Island and Vermont,[1] *19 appear to be the only jurisdictions with no appellate decision on the issue of admissibility of polygraph evidence. In 22 states polygraph evidence is admissible upon stipulation, and in another 21 states polygraph evidence is not admissible in any circumstance. Four states, Louisiana, Massachusettes, Michigan, and New Mexico, may admit polygraph evidence without stipulation. See Ansley, N., Quick Reference Guide to Polygraph Admissibility, Licensing Laws and Limiting Laws, (1984). The United States Supreme Court has not stated an opinion on polygraph evidence, and the Federal Circuit appears to be split, with four courts permitting such evidence on stipulation, five leaving the issue to the discretion of the trial court, and two excluding such evidence.
We note that the accuracy of polygraph examination is directly proportional to the skill of the examiner. Ferguson, R.J., Jr., and Allan L. Miller, The Polygraph in Court, 43 (1973). As was stated in People v. Anderson, 637 P.2d 354, 360 (Colo. 1981), "polygraphy, albeit based upon a scientific theory, remains an art with an unusual responsibility placed on the examiner." Also a consideration is the selection of the actual questions asked during the polygraph examination. People v. Anderson, supra, indicates that the crux of the polygraph technique is the development of neutral, control and relevant questions since all polygraph tests are preceded by a pretest interview in which background information is obtained from the subject and relevant questions are developed and reviewed with the subject. These questions were recently reviewed by the New Mexico Court of Appeals in State v. Anthony, 100 N.M. 735, 676 P.2d 262, 266, (Ct.App. 1983), wherein it was stated:
"Experts are virtually unanimous that unless the `relevant' questions are carefully formulated, the test results are suspect. A relevant question means a `clear and concise question which refers to specific objective facts directly related to the purpose of the examination and does not allow rationalization in the answer.'" (Citations omitted.)
These same concerns are dealth with in New Mexico's rules of evidence wherein are established the minimum qualifications for a polygraph examiner and wherein are placed certain restrictions on the admissibility of the results. N.M.R.Evid. 707. See also State v. Dorsey, 88 N.M. 184, 539 P.2d 204 (1975); State v. Anthony, 100 N.M. 735, 676 P.2d 262 (Ct.App. 1983). We have no such safeguard in our rules of evidence, nor is there a licensing requirement in Idaho for polygraphers.
In Idaho, Child Protective Act proceedings are civil in nature and adjudicated by a court without a jury. Because of the nature of the other type of evidence admitted into such proceedings, and the extreme difficulty as noted herein, of the proof, we hold that polygraph evidence will be admissible in Child Protective Act proceedings where sexual abuse is alleged and the majority, if not sole, evidence offered to prove the sexual abuse is of the type in the case at bar. Such polygraph evidence will be admissible whether offered by or on behalf of the accused or the victim. The weight to be given polygraph examination testimony is in the discretion of the trial court in view of the qualifications and experience of the examiner and the particular questions asked of the subject.
This case is reversed and remanded to the magistrate court for consideration of the testimony of the verbalization of the alleged victim and the consideration of the videotape of the interview of the victim. Thereafter, the trial court shall enter specific findings of fact relating to his view of such evidence.
No costs allowed. No attorney fees on appeal.
DONALDSON, C.J., and HUNTLEY, J., concur.
*20 BAKES, Justice, dissenting:
The magistrate's decision contains adequate, albeit brief findings indicating that the Department of Health & Welfare, which had the burden of proof, failed to convince him by a preponderance of the evidence. That has been adequate in prior cases, and I believe it is adequate in this case. Accordingly, I would affirm the judgments below.
BISTLINE, Justice, concurring in part with the views of BAKES, Justice.

I.
As Bakes, J., has written, the Department as the moving party in this civil prosecution had the burden of proof. In the eyes of the magistrate, the evidence adduced by the Department, much of which was contradicted or impeached by the defendant, simply did not persuade the trial magistrate, Judge Alfred O. Perry, that the Department was entitled to the severe relief which its claim, if granted, would have imposed on defendant. The district court, on its appellate review of the record, was not persuaded of any error on the part of the magistrate. As with Justice Bakes, nor am I. Nor do I see that Justice Shepard (even though with two votes for his opinion he commands a majority) with any degree of clarity points to any reversible error on the part of the magistrate. Making the majority opinion of even less validity, it points to no error whatever, an important point which may have eluded Justice Bakes, and to which his attention is invited. Instead of reversing for error, the majority concedely is reversing Judge Perry solely that he can for a second time consider the "verbalization" testimony and the videotape. All that I can make of this unique appellate decision is that those justices who comprise the majority, had each been the trial judge, would have more explicity remarked that he had indeed considered the "verbalization" testimony which he had heard, and indeed had also given due consideration to the videotape which he had seen. It is exactly such groundless appellate reversals which tend to diminish popular esteem for the judicial system.

II.
The Canyon County Prosecuting Attorney, who undertook this civil prosecution on behalf of the Department of Health and Welfare, would have received the magistrate's decision late in the afternoon of February 10, or on the following day, which is readily deducible where the clerk's stamp thereon shows a filing of 2:00 p.m. on February 10, 1984. The prosecuting attorney reacted precipitately to the decision adverse to his client. An appeal was taken to district court on February 13, 1984, notwithstanding that the prosecutor had 30 days in which to file such an appeal, and also notwithstanding that available to the prosecutor were the following avenues of relief, most of which would have tolled and thus extended the 30-day time limitation on appeals to district court: a motion for reconsideration, a motion for a new trial, a motion to take additional testimony, a motion to amend findings of fact and conclusions of law, and a motion to direct the entry of a new judgment. I.R.C.P. 59(a)(7).[1]

III.
The majority opinion makes no mention of appellate proceedings in the district *21 court beyond reciting that there was an order of the district court which affirmed Judge Perry's dismissal of the prosecuting attorney's petition. To the contrary, however, both parties provided the district court with excellent briefs which laid before the district court exhaustive citation to authority pertinent to the issues presented on the appeal.[2] Those issues were stated in the Department's brief as follows:
Are polygraph examinations admissible as evidence in a court proceeding?
Are the trial court's findings of fact clearly erroneous?
Almost all of the Department's appellate brief filed with the district court was devoted to arguing error in the admission of the report of the polygraph examination.[3] Only two and one-half pages argued that the findings of fact were clearly erroneous. R., pp. 46-48.
Judge Perry in his findings and conclusions made reference to a report to the Court from the Department, filed December 2, 1983  which would have been five days after the Department's Petition (Complaint) was filed. That report, signed but not sworn to by a Health and Welfare social worker, is in the record. Significantly, this report was based entirely on Health and Welfare interviews of the child which all took place before the filing of the complaint  and all of which were not conducted in the presence of the defendant or any attorney on his behalf.
This report to the court contained the following accounts of these "interviews"  to indulge in a loose use of the English language:
When Mrs. Syme first suspected that her husband had molested her almost 4-year-old daughter, she reportedly sought help through Dr. Dwight Mowry, Psychologist. [The child's] lack of verbal skills prevented Dr. Mowry from making any kind of conclusion about the accusations.
[The child] was interviewed by Pamela Crookston, Social Work Specialist Sr. at Mental Health, and Dr. Phil McQueen, Psychologist Specialist at Mental Health, October 12, 1983. At that time, [the child] indicated that she had been involved in sexual activity with her father, Tim Syme; her brother, . .. and her mother, Donna Syme. This was shown by the use of anatomically correct dolls and by nodding her head "yes" or "no" in response to the examiner's questions. [The child] also indicated during this interview that her father and brother ... did the "secret" things together with her in the living room.
On October 17, 1983 [the child] was seen again by Dr. Phil McQueen. She affirmed that there were sexual "secrets" between her mother, father, and brother, .. .
Using the anatomically correct dolls, [the child] depicted the father doll sitting on a chair and placing the girl doll on his lap with her legs apart and putting the father doll's penis between her legs. She could not say how frequently this happened, as she can only count to eight, and it happened more than that.
[The child] also affirmed [author's note: "affirmed" is to be distinguished from "said" or "stated." "Affirmed" is necessarily in Departmentese an antonym for "verbalized." See next paragraph.] that the secret touching with her dad and her brother, ... included them touching her genitals with their mouth and penis.
[The child] participates in the little girls' group through SANE. November 18, 1983 was the first time she verbalized that secret touching had occurred.
After receiving the child protection complaint of alleged sexual abuse, this *22 worker arranged for [the child] to be interviewed on November 23, 1983 at the Caldwell Health and Welfare office. Because the alleged incidents took place in Fruitland, Idaho, present at the interview was a representative from the Payette County Sheriff's Department and the Payette County Prosecutor's Office. Also present was Ed Hagan, Juvenile Officer of the Caldwell Police Department, and this worker. Dr. Phil McQueen and Pamela Crookston conducted the interview, which was video taped. The results of this interview were similar to the previous interviews, although [the child] also implicated [a second] brother.
[The first brother] was also interviewed by Dr. McQueen November 23, 1983, as it was suspected by his mother, Donna Syme, that he also was sexually molested by his father. This interview presented no conclusive evidence as to whether or not sexual activity occurred between Chad [the first brother] and his father.
... .
Dr. Shaffer examined [the child] November 29, 1983 and will provide a written report to the Department of Health and Welfare prior to the adjudicatory hearing. She stated that the hymen appeared intact, and the anal opening was of normal size. She stated that because the alleged sexual incidents were not recent, there were no signs of trauma. When asked by this worker if she could rule out penetration, she stated that she could not. This report will be available at the time of the adjudicatory hearing December 8, 1983.
This worker requested that Dr. Phil McQueen evaluate both Mrs. Syme and [the child]. This was done on December 1, 1983. The results will be available prior to the adjudicatory hearing and a report presented to the Court.
... .
It is felt by this worker that [the child] is a victim of sexual abuse, and it is necessary that she be involved in treatment... . R., pp. 8-11.
The author of the report, did not testify at the hearing which took place on the sixth day of February 1984,[4] but it is evident from a reading of Judge Perry's written decision that in considering the report[5] he accorded it as the equivalent of testimony on her part. In my perception, Judge Perry, in the two paragraphs of his decision where he mentioned "verbalization," was doing so in context of the Health and Welfare report of which he first made mention, and I do not see that any other conclusion is possible:
In report to the court from the Department of Health and Welfare, filed December 2, 1983, the allegation is made that at that interview the child indicated a sexual contact with her father and brother. The child is not quite 5 years of age. From the testimony it appears there was no verbalization from the child. Apparently statements were made to her and she either nodded "yes" or "no."
It also appears she, ... was placed in the SANE program. The report alleges here she verbalized the incidents, but such testimony was not presented to the court, only that the child finally interacted.
That being so, and even if it not be so, there is nothing to substantiate the majority view that Judge Perry be reversed simply because the majority "believes it more desirable that the "magistrate himself make clear why the verbalization described by Dr. McQueen and also shown in the *23 videotaped interview by Dr. McQueen was not considered in the findings."
The Department in support of its challenge to Judge Perry's findings as being clearly erroneous raised on appeal in the district court argued only that "specific instances of verbalization [by the child] are reflected throughout the record," R., p. 46, and treats Judge Perry's analysis and interpretation of the report signed by Francie Wilson as a finding that there was no verbalization at the February 6 final hearing. The Department's brief clearly misconstrued the written word, and having in effect erroneously set up a straw man, pointed to trial testimony of Dr. McQueen, and concludes its presentation on this issue by urging that "the record does not support the findings made by [Judge Perry] on this critical issue [verbalization]." The Department's second issue was clearly without any merit.

IV.
On appeal to this Court the Department's brief on the second issue is nothing more than mere repetition of its brief in the district court and adds only that the district court erred in not finding that the magistrate erred in not finding that the child verbalized at least to a limited extent. Judge Perry, however, made no such finding relative to the evidence submitted at the final hearing on February 6. The majority opinion implicitly recognizes this at p. 16 of the slip opinion where it does not agree that there was any such error as the Department contended. Instead, as has been noted, the majority simply desires that Judge Perry explain why he made no specific mention of the scant verbalization testimony of Dr. McQueen taken at trial, and likewise with the videotape.

V.
Courts are required to make findings of fact on all material issues. But here the issue was whether or not defendant was guilty of sexually molesting the child. The issue was not whether the child verbalized. Judge Perry, while he might have commented on that aspect of the evidence adduced, was no more obliged to do that than is a trial court required to make evidentiary findings, i.e., spell out all of the evidence which was received  much in the manner as is being done in the findings prepared by hearing officers employed by the Industrial Commission and by the Department of Employment. As Justice Knudson wrote for the Court in Angleton v. Angleton, 84 Idaho 184, 370 P.2d 788 (1962), the findings of fact required by I.R.C.P. 52(a) are of ultimate facts. Quoting from 5 Moore's Federal Practice, 2d ed., 2606, that Court provided guidance which today's majority should consider: "the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts." Angleton, supra, 84 Idaho at 191, 370 P.2d at 791. Citing Petterson Lighterage & Towing Corp. v. N.Y. Central R.R. Co., 126 F.2d 992 (C.C.A. 2nd Cir.1942), the Court added: "Findings should not be discursive; they should not state the evidence or any of the reasoning upon the evidence... ." Angleton, supra, 84 Idaho at 191, 370 P.2d at 791. Noting that in Angleton, as is equally so here, the issues were few, the Court disposed of the contention that findings had not been made on all material issues.
This Court has repeatedly held that findings of fact will be liberally construed in favor of the judgment and on appeal this Court is entitled to draw the necessary inferences from the trial court's express findings in order to support the judgment. Cazier v. Economy Cash Stores, 71 Idaho 178, 228 P.2d 436; Gem State Lumber Co. v. Galion Irr. Land Co., 55 Idaho 314, 41 P.2d 620; Dickey v. Clarke, 65 Idaho 247, 142 P.2d 597. Rule 1 I.R.C.P. specifically provides that the rules (included 52(a)) shall be "liberally construed to secure the just, speedy and inexpensive determination of every action and proceeding." Id., 84 Idaho at 192-93, 370 P.2d at 792-93 (emphasis added).
*24 Just the other day this Court in Rueth v. State, 103 Idaho 74, 77, 644 P.2d 1333, 1336 (1982) commented similarly:
Under this rule of procedure, a trial court's findings of fact will be liberally construed in favor of the judgment entered, and on appeal, the findings of fact will not be disturbed unless clearly erroneous. Javernick v. Smith, 101 Idaho 104, 609 P.2d 171 (1980); Roemer v. Green Pastures Farms, Inc., 97 Idaho 591, 548 P.2d 857 (1976). As the court stated in Watkins v. Watkins, 76 Idaho 316, 325, 281 P.2d 1057, 1062 (1955), upon appellate review, the findings of fact of the trial court will be accepted if they are supported by "substantial, competent though conflicting evidence, however meager." This standard of appellate review is salutory in effect, and reflects the view that deference must be afforded to the special opportunity to assess and weigh the credibility of the witnesses who appear before it personally. Jensen v. Bledsoe, 100 Idaho 84, 593 P.2d 988 (1979). (Emphasis added.)
If the magistrate judge's decision here were "liberally construed in [its] favor," id., there would be no room for the majority to reverse upon mere guesses of whether the videotapes were or were not considered. The rule in Idaho is that "there is a presumption of regularity in the performance of official duties by public officers." Horner v. Ponderosa Pine Logging, 107 Idaho 1111, 1114, 695 P.2d 1250, 1253 (1985); Farm Bureau Co., Inc. v. Carrey, 100 Idaho 745, 750, 605 P.2d 509, 514 (1980). It is inferable and to be presumed that Judge Perry considered all of the evidence which was introduced in the one-day hearing. To opine otherwise borders on the absurd and is pure surmise contrary to appellate procedural principles announced by this Court. Furthermore, that the majority might "infer" or deem "desirable", supra, p. 16, does not mean that the judge made errors in his findings that are clearly erroneous. The issue presented by the Department is whether the magistrate was clearly erroneous in holding as he did  that the Department of Health and Welfare failed to prove by a preponderance of the evidence that the child in this case was sexually abused. My careful review of the record convinces me that the magistrate has not so erred, and the Court today without hesitation would affirm the judges decision.
Apparently, Judge Perry can on remand satisfy the desires of the majority by adding a sentence to his opinion stating something to the effect that he did in fact consider the videotapes and Dr. McQueen's testimony on verbalization by the child, but such did not alter his ultimate finding on the issue of alleged sexual molestation in which he concluded that the Department had not sustained its burden of proof. The net result of this Court's majority opinion is that this controversy is for no good reason prolonged, and in the process Judge Perry is reversed  albeit he committed no error. The majority opinion, which is to be commended for its view on the use of the polygraph test, has served no other purpose. It is regrettable that one of our trial judges, and in turn a district judge sitting as a one-man appellate court, has his record tarnished, which I say because the majority's laudable opinion on the use of the polygraph examination could have been rendered while affirming the lower court.

VI.
It is impossible to read this record without concurring wholeheartedly with the views of Judge Perry. The two Department employees, Dr. McQueen and social worker Crookston, undoubtedly well-intended, had been influenced by the child's mother to the notion that the defendant was guilty as charged by the mother. Thereafter these Department employees initiated and continued their "interviews" of the child in an obvious effort to obtain some kind of "affirmation" from the child as to the veracity of the mother's charges. Judge Perry, making his own written decision as the rules and decisions of this Court require, "verbalized" his views of these interviews  all of which were conducted *25 without notice to the defendant or an attorney of his choice:
Dr. McQueen's interview, the interviews with the other staff members, the SANE program and peer associations at these meetings and the numerous interrogations this child has been subjected to, at the very least, gives this Court concern of an extreme contamination of any information she (the child) might supply because of the statements and suggestions she has experienced in all these examinations. R., p. 22.
Judge Perry's acumen in this regard is commendable. The child involved was shy of being five years old. Our trial courts on a regular basis instruct jurors that in reaching their verdicts they collectively have the advantage of the experience and wisdom of twelve persons gained from their everyday living, AND, they are at liberty to use this knowledge in their deliberations. The same is equally true of trial judges, and, one would like to think, appellate judges as well. Jurors and judges alike do not raise children without knowing of the susceptibility of young minds to the power of suggestion. Hypnosis, of course, while it is the ultimate in the use (and misuse) of the power of suggestion, is not the only successful method of tampering with the mind. Repetition can do the job. This is especially so with the minds of children. Children generally will try to give the responses which they believe their interrogators are seeking. In State v. Iwakiri, 106 Idaho 618, 625, 682 P.2d 571, 578 (1984), Justice Bakes, in authoring this Court's opinion, laid out safeguards for the use of hypnosis:
(1) The hypnotic session should be conducted by a licensed psychiatrist or psychologist trained in the use of hypnosis and thus aware of its possible effects on memory, so as to aid in the prevention of cueing and improper suggestion.
(2) The person conducting the session should be independent from either of the parties in the case.
(3) Information given to the hypnotist by either party concerning the case should be noted, preferably in written form, so that the extent of information the subject received from the hypnotist may be determined.
(4) Before hypnosis, the hypnotist should obtain a detailed description of the facts from the subject, avoiding adding new elements to the subject's description.
(5) The session should be recorded so a permanent record is available to ensure against suggestive procedures. Videotape is a preferable method of recordation, but not mandatory.
(6) Preferably, only the hypnotist and subject should be present during any phase of the hypnotic session, but other persons should be allowed to attend if their attendance can be shown to be essential and steps are taken to prevent their influencing the results of the session (i.e., they are not allowed to participate in the session, etc.).
There is every good reason why the type of "interviews" of the child here conducted by the Department of Health and Welfare employees should be subjected to similar rules. Obviously in this case there would be a flagrant violation of Rule 2; it is the Department who wants to prove its case against the defendant. Hence the Department is far from being independent of the parties. Rule 6 would require that such an "interview" not take place without the defendant being accorded the opportunity to observe  either in person, by counsel, or both.
In Iwakiri, Justice Bakes also wrote that "A witness who has the ability to observe, perceive and testify accurately should be allowed to testify to those facts relevant to the case at hand." Id. 106 Idaho at 626, 682 P.2d at 579.
The majority today expresses no concern for the proposition that if the child could verbalize, then the Department should have either (1) produced her as a witness, or (2) requested that Judge Perry interview her in chambers. Probably, after what the child had been put through, testifying in court before a friendly judge would not have inhibited or intimidated her in the *26 least. If such appeared to be happening, a private interview with the court would not have violated any case-precedent with which I am presently familiar. Recollection tells me that in child custody proceedings either or both procedures are used.[6] Nothing in this record suggests any reason why the Department  now so vocal in its argument that the child verbalized  did not present the child before the court. Instead, as Judge Perry commented in his findings, "The report alleges here [at SANE] she verbalized the incidents, but such testimony was not presented to the court, only that the child finally interacted." R., p. 22. What better place to verbalize than to the judge. Better sayeth the Department that the judge hear from its people their interpretation as to what the child "affirmed" to its employees  no one else in attendance. R., p. 22.

VII.
Finally, proper regard should be had for Judge Perry's highly pertinent evaluation as to the credibility and weight to be given Dr. McQueen's interviews and ensuing testimony:
Not only does there exist the very real possibility of contamination of any information the youngster might give, but there was another witness, Dr. John Dawson, with credentials equal to that of the States' witnesses, who contradicted the methods used by Dr. McQueen and his findings were dramatically opposed to Dr. McQueen's as to whether any activities had occurred after he interviewed [the child.] R., p. 22.
Such issues have always been held to be within the province of the trial court.
NOTES
[1] In State v. Hamlin, 499 A.2d 45 (Vt. 1985), the Vermont Supreme Court examined whether the lower court erred in refusing to decide whether the results of a polygraph test of the defendant's companion were admissible at trial. The court did not focus on the proper standard for admissibility, and held that regardless of whether a trial court has discretion to admit polygraph examination results, the defendant failed to lay the proper foundation.
[1] Resort to any of these motions pursuant to Rule 59(a)(7) would have precluded the sandbagging of Judge Perry here. As Justice Shepard stated in Stecklein v. Montgomery, 98 Idaho 671, 677, 570 P.2d 1359, 1365 (1977) (Shepard, J., dissenting):

The majority faults the trial court for its failure to enter a finding of fact specifically dealing with [the] alleged issue. Defendant sought no finding of fact... . Following the court's issuance of its findings and conclusions, no amendment was sought thereto by the defendant... .
The law in Idaho is established that unless an issue was clearly raised at trial and a fair opportunity was thus afforded the trial court to rule on such issue, it will not be reviewed on appeal. [Citations omitted.] In my judgment the instant case demonstrates the need for such a salutory rule. It is designed to prevent "sandbagging" of a trial court, a result which the majority here condones.
[2] Defendant's 20-page typewritten brief was signed by Joel E. Tingay. The Department's brief of 20 pages was signed by Deputy Prosecutor George Breitsameter. Both briefs were on 14-inch paper.
[3] I have no great concern with the majority's views on use of the polygraph test  other than to note that the majority sees no error, and the use of such tests now has high judicial sanction.
[4] Only two witnesses called on behalf of the Department, Dr. Phil McQueen, who is a psychologist employed by the Department, and Pamela Crookston, who is a social worker employed by the Department. Dr. Mowry was not called. Dr. Shaffer did not testify.
[5] The report appears to be that required by I.C. § 16-1609. The court minutes of December 8, 1983 reflect that Francie Hill, of the Department, had submitted her report on a voluntary basis, i.e., absent any direction from the court to do so  although in the court minutes of November 28, 1983 the court expressed further opinions on the matter and requested the Department of Health and Welfare have more details to present at the adjudicatory hearing.
[6] For guidance in a similar situation where the Department was involved, see Yearsley v. Yearsley, 94 Idaho 667, 674, 496 P.2d 666, 673 (1982) (Shepard, J., dissenting, final paragraph).